[S. F. No. 11258.  In Bank.—December 22, 1924.]

DOBLE STEAM MOTORS CORPORATION (a Corporation), Petitioner, v. EDWIN M. DAUGHERTY, as Commissioner of Corporations of State of California, Respondent.

[1] CORPORATE SECURITIES ACT — UNAUTHORIZED SUBSCRIPTIONS FOR STOCK—APPLICATION FOR ISSUANCE OF STOCK—DISCRETION OF CORPORATION COMMISSIONER.—Where a petition by a corporation to the State Corporation Commissioner shows that after the sale of certain stock of the corporation authorized to be issued and sold, the agent who had sold said stock took subscriptions for additional stock, without a permit having been issued therefor, some of which subscriptions were paid to said agent in full and the balance in part, but that owing to financial reverses the agent was unable to fulfill his contracts with relation to said subscriptions, the petitioner seeking permission to issue stock to all said subscribers who had paid in full and to all others who had partly paid, upon payment of the balance of their subscriptions, which would result in the corporation receiving considerably less than half of the money called for by the subscriptions, upon the facts alleged the matter is, under the "Corporate Securities Act," within the discretion of the Commissioner to determine whether the illegal subscriptions should be ratified, and whether the loss should fall upon the subscribers or upon the corporation; and there is no abuse of discretion in the Commissioner denying said application without any further showing than that contained in the petition itself.

[2] ID.—POWERS OF COMMISSIONER—PASSING ON APPLICATION TO ISSUE STOCK.—Under the "Corporate Securities Act," discretion is reposed in the Commissioner of Corporations to grant or deny a permit to a corporation to issue and sell any particular portion of its capital stock whenever upon the face of the application for such permit a state of facts is disclosed concerning which, taking them to be true as alleged in said application, there is room for a reasonable difference of opinion as to whether the proposed plan of the applicant for the issuance of its securities and the proposed methods to be used by it in issuing or disposing of them will be fair or unfair, just or unjust, equitable or inequitable; and as to whether their issuance and disposition upon the proposed plan of business of the applicant will or will not work a fraud upon the purchaser of such securities.

1.  Blue sky laws, notes, 15 A. L. R. 262; 24 A. L. R. 523; 27 A. L. R. 1169; 30 A. L. R. 1331.  See, also, 6 Cal. Jur. 778–782.

[3] BOARDS — JURISDICTION—DISCRETION—REVIEW BY COURTS. — When subordinate boards or commissioners are by statute invested with discretion with respect to the exercise of their powers, courts will not interfere with such discretion in the absence of grave reasons tending to show that fraud, corruption, improper motives or influences, plain disregard of duty, gross abuse of power, or violation of law has entered into or characterized the determination of such body.

[4] CORPORATE SECURITIES ACT — SUBSCRIPTIONS FOR STOCK WITHOUT PERMIT—SURRENDER OF OTHER STOCK—VALUE—DETERMINATION—RECORDS.—On an application by a corporation to the State Corporation Commissioner for a permit to issue a certain amount of its stock on subscriptions taken by an agent without a permit therefor, some of which subscriptions have been paid in full and the balance in part to the agent, who by reason of financial reverses has been unable to fulfill his contracts on the subscription, and the issuance of which stock would result in the corporation receiving considerably less than one-half of the subscription price, the fact that the applicant alleges in its petition that, in order that it may receive an adequate consideration for the stock, it has arranged for the surrender and return to its treasury of a certain amount of stock theretofore issued under permit, which it alleges to be of a certain par value, does not require the Commissioner to assume the allegations to be true, or to hold a hearing thereon at which the applicant may present proof, but he may examine the records of his office with relation to the transaction to ascertain the value of the stock to be surrendered.

[5] ID.—CONTRACTS—VALUE—DISCRETION.—Upon such an application, the feasibility of the successful execution of certain contracts which the corporation has entered into, and the ultimate values to flow therefrom to it, upon which practical minds might differ, are matters with which the discretion of the Corporation Commissioner is to be exercised.

[6] ID. — REQUIREMENTS FOR ISSUANCE OF PERMIT — EXAMINATION OF RECORDS—PRESUMPTIONS.—Upon such an application, where reference is made by the applicant to a previous application on its part, the Commissioner is entitled to have full access to his records on the former application, to the basis of his conclusions and ruling thereon, and to the conditions imposed for the issuance of stock then or in the future; and where it is not shown in the later application or in a petition for a writ of mandate to compel the issuance of the permit sought what the Commissioner's

3. Supervisory control of courts over board exercising discretionary powers, note, 2 Ann. Cas. 543.

records showed as a basis or justification for his requirements on the previous application, it must be assumed that they were fully justified and entirely reasonable.

(1) 37 **C. J.**, p. 272, sec. 165.    (2) 37 **C. J.**, p. 272, sec. 165.    (3) 37 **C. J.**, p. 272, sec. 165.    (4) 37 **C. J.**, p. 272, sec. 165.    (5) 37 **C. J.**, p. 272, sec. 165.    (6) 38 **C. J.**, p. 913, sec. 670.

APPLICATION for a Writ of Mandate to require the Corporation Commissioner to issue a permit for the issuance of stock by a corporation.    Writ denied.

The facts are stated in the opinion of the court.

Haven, Athearn, Chandler & Farmer for Petitioner.

U. S. Webb, Attorney-General, H. H. Linney, Deputy Attorney-General, Robert W. Harrison, Deputy Attorney-General, and J. C. McMillan, Deputy Corporation Commissioner, for Respondent.

RICHARDS, J.—This application is for a writ of mandate whereby the petitioner seeks to compel the respondent, Edwin M. Daugherty, as Commissioner of Corporations of the State of California, to issue his official permit to the petitioner, authorizing it to issue and deliver certain shares of its capital stock to certain persons and under certain conditions as set forth in its said petition, and which permit upon its application to and demand upon said respondent as such Commissioner he has refused to issue. The respondent appeared in response to the alternative writ of mandate issued herein and demurred to said petition upon the general ground and also filed an answer in the first instance wherein certain of the averments of the petition were admitted and others denied in general terms; and wherein also the respondent affirmatively averred that he had duly and regularly considered said application for said permit and had thereafter issued his order denying the same for the reasons stated in his order of denial and for certain other and further reasons set forth in his said answer. At a later period in these proceedings the respondent applied for and was granted leave to file, and did file, an amended answer and return to said petition, wherein the respondent set forth

with much greater detail his objections to the issuance of said permit and his reasons for denying the petitioner's application for the issuance of the same, in the course of which the respondent denied certain of the averments of the petition which had been admitted in his former answer; and wherein also the respondent set forth with much of circumstance and detail the facts and the history of certain prior applications of the petitioner herein to said Commissioner for permits to issue and sell other portions of its capital stock and also issue and dispose of the same portion thereof which is embraced in and referred to in its latest application, the denial of which forms the basis of the present proceeding. To this amended answer and return of the respondent the petitioner herein has presented a demurrer upon the ground that those portions thereof which contain the respondent's denials to said petition do not, nor do any of them, state facts sufficient to constitute a defense to the said petition, and has also presented a demurrer to the affirmative averments of said amended answer and return upon the same ground. The petitioner has also presented and filed several affidavits of its officers and counsel constituting specific denials and counter-averments respecting the matters alleged in the respondent's answer by way of affirmative defense to the issuance of the writ of mandate herein. To such of the matter set forth in said affidavits as would constitute new matter the respondent has presented a counter-affidavit embracing matter denying or purporting to qualify the same. In this state of the record this matter came on for hearing before this court and was elaborately argued by respective counsel. In the natural order of things, the first questions discussed upon that argument and presented to us for primary consideration are those arising upon the respondent's demurrer to the petition. After alleging the corporate character of the petitioner, Doble Steam Motors Corporation, and the official status of the respondent as Commissioner of Corporations of the State of California, the petitioner proceeds to allege that on or about June 10, 1924, it filed with said Commissioner its application for permission to issue and sell 37,000 shares of its class "A" common capital stock for the purpose and considerations and subject to the terms and conditions contained in said application which is attached to and made a part of the petition herein. [1] Re-

195 Cal.—11

ferring to said exhibit for further light upon the contents of its said application we find it stated in the opening paragraphs thereof that the applicant had theretofore been granted permission to sell and issue 100,000 shares of its said class ''A'' common stock subject to the provisions of two certain permits so to do issued by the Commissioner of Corporations on October 2, 1922, and March 12, 1923, respectively, and that all of said 100,000 shares of said stock had been issued and sold through F. G. Cox and F. G. Cox Inc. for and on behalf of said applicant and in accordance with the terms and provisions of said permits. The applicant then proceeds to set forth that in addition to said 100,000 shares of said stock so sold and issued under and in accordance with said permission so to do the applicant is informed and believes subscriptions have been taken for additional shares of said class ''A'' common stock at the price of $12.50 per share; that a large number of the subscriptions so taken have been paid for in full and that there still remains a large number of said subscriptions, payments upon which have not yet been completed, and that demand has been made upon the applicant on the part of those subscribers which have paid for their subscriptions in full that it issue the stock which has thus been fully paid for to the subscribers therefor. The applicant does not at this point in its application state by whom or by what authority said subscriptions for said stock, over and above the amount for which permits to issue and sell stock had theretofore been granted, had been taken, but in a later portion of its said application it appears that the person who had taken said subscriptions for said latter stock was F. G. Cox, a licensed broker, and the same person who, as the authorized agent of the applicant, had theretofore acted for and on behalf of the applicant in the subscription for and sale of the 100,000 shares of said stock for which permits had been regularly issued. The number of shares of said stock which said F. G. Cox has thus taken subscriptions for in excess of any issued permits for the issuance and sale is nowhere exactly stated in said application and is only inferentially to be surmised from the fact that the applicant is seeking by its said application to be permitted to issue and sell 37,000 shares of its said class ''A'' common stock at the price of $12.50 per share, in order to take care of

said subscriptions, and which, if sold at that price, would realize the sum of $452,500. It is, however, stated in said application that subsequent to June 20, 1923, said F. G. Cox, who had taken said subscriptions for said stock and had received whatever sums of money, had been paid in full or in part upon the subscription price of said stock, viz., $12.50 per share, had met with financial reverses and was and is unable to fulfill his contracts with relation to said subscriptions for said stock. It further appears from said application that the total amount of money which the applicant expects to receive on account of said subscriptions if permitted to fill the same is the sum of approximately $200,000, which it will be seen is considerably less than one-half of the amount for which the sale of said stock has been contracted for by the terms of said subscriptions. In its prayer attached to said application the applicant prays for a permit to issue and deliver said 37,000 shares of its class ''A'' common stock to all persons who have thus purchased petitioner's stock from F. G. Cox or F. G. Cox Inc. and have fully paid for the same and to all persons to whom said F. G. Cox or F. G. Cox Inc. has agreed to sell said stock and who have not yet fully paid for the same when they shall have fully paid therefor the purchase price of $12.50 per share.

Considering the foregoing averments of said application apart from those other averments thereof which purport to set forth the further and additional reasons why the permit asked for should issue, and considering the same also as an essential part of the petition herein and as furnishing the main reason why the respondent herein should be compelled by this court to issue the permit prayed for in said application, it would seem to be plain that the matters above presented were such as upon the face of said application would call for and require the exercise of a wise discretion on the part of the Commissioner of Corporations in determining whether or not he would ratify and approve the unauthorized and to that extent illegal subscription contracts of said F. G. Cox or F. G. Cox Inc., whether acting as the authorized agents of the applicant or not, calling for the issuance and sale of a large block of the class ''A'' common stock of said applicant in the absence of any permit authorizing the taking of said subscriptions or the issuance

and sale of said stock; and it would seem further that not only was the exercise of such discretion on the part of said Commissioner invoked in the above particular, but that his discretion was also appealed to in determining whether the aforesaid subscriptions should be legalized and approved when, upon the face of said application, it affirmatively appeared that more than one-half of the purchase price of said stock would be lost to said applicant through the financial inability of said Cox to pay over to said applicant all or a large part of the moneys he had received on account of said unauthorized subscriptions to said stock. Whether or not this admitted loss to the extent of more than one-half of the purchase price of said stock should be cast upon said applicant through the ratification by the Commissioner of said unauthorized subscriptions to said stock or should fall upon the unfortunate subscribers thereto was a matter which clearly required the exercise of a wise discretion on the part of the said Commissioner in order to determine where, in the interests of said applicant, and also where, as a matter of public policy, such loss should fall. That such Commissioner is invested with the exercise of such discretion in matters of this character is, we think, clearly discernible from the provisions of the so-called "Corporate Securities Act" as originally adopted in 1917 (Stats. 1917, p. 680) and as since several times amended. (Stats. 1919, p. 231; Stats. 1921, pp. 1008, 1114; Stats. 1923, pp. 87, 91.) Section 3 of said act provides that no "Company" [which term includes corporations] "shall sell . . . or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the Commissioner a permit authorizing it so to do." Said section of the act proceeds to set forth in much of detail the matters which are to be embraced in said application. Section 4 of said act reads, in part, as follows: "Upon the filing of such application, it shall be the duty of the commissioner to examine it and the other papers and documents filed therewith, and he may, if he deems it advisable, make or have made a detailed examination, audit, and investigation of the applicant and its affairs. If he finds that the proposed plan of business of the applicant is not unfair, unjust or inequitable, that it intends to fairly and honestly transact its business, and that the securities that it proposes

to issue and the methods to be used by it in issuing or disposing of 'them are not such as, in his opinion, will work a fraud upon the purchaser thereof, the commissioner shall issue to the applicant a permit åuthorizing it to issue and dispose of securities, as therein provided for, in this state, in such amounts and for such considerations and upon such terms and conditions as the commissioner may in said permit provide. Otherwise, he shall deny the application and refuse such permit and notify the applicant in writing of his decision.'' [2] It seems to us manifest from the foregoing provisions of the ''Corporate Securities Act'' that discretion is reposed in the Commissioner to grant or to deny a permit to a corporation to issue and sell any particular portion of its capital stock whenever upon the face of the application for such permit a state of facts is disclosed concerning which, taking them to be true as alleged in said application, there is room for a reasonable difference of opinion as to whether the proposed plan of the applicant for the issuance of its securities and the proposed methods to be used by it in issuing or disposing of them will be fair or unfair, just or unjust, equitable or inequitable; and as to whether their issuance and disposition upon the proposed plan of business of the applicant will or will not work a fraud upon the purchaser of such securities. In the case of *Suckow* v. *Alderson,* 182 Cal. 247 [187 Pac. 965], which was a proceeding wherein it was sought to have reviewed the action of the board of medical examiners in revoking the license to practice medicine of the petitioner, this court considered the nature of the powers exercised by subordinate boards and tribunals invested by statute with various functions having to do with the properties or rights of the citizen, and upon a full review of the earlier cases upon the subject held that such powers were *quasi* judicial in character. In the more recent case of *Brecheen* v. *Riley,* 187 Cal. 121 [200 Pac. 1042], which was a proceeding to have reviewed the action of the real estate commissioner in determining to revoke the real estate license of the petitioner therein, this court, approving its above former decision, held that the commissioner in passing upon applications for real estate licenses or upon petitions for their revocation was engaged in the exercise of a *quasi*-judicial function involving the exercise of discretion in the

discharge of the duties of his office. **[3]** In the case of *Union Transp. Co.* v. *Bassett*, 118 Cal. 604 [50 Pac. 754], which was a proceeding in equity brought to enjoin the board of harbor commissioners from putting into effect an order of said board with respect to certain docking facilities, this court held that when subordinate boards or commissioners were by statute invested with discretion with respect to the exercise of their powers, courts would not interfere with such discretion in the absence of grave reasons tending to show that fraud, corruption, improper motives or influences, plain disregard of duty, gross abuse of power, or violation of law had entered into or characterized the determination of such body; and that in the absence of such showing of an abuse of discretion the determination of such board or commission would not be interfered with or overthrown. Applying these principles to the facts as thus far stated and considered and as they appear upon the face of the petitioner's application before the Corporation Commissioner and as they are also made to appear upon the face of its petition for this writ, we are clearly of the opinion that the Corporation Commissioner committed no abuse of discretion with which, by the terms of the "Corporate Securities Act" he was invested, in denying without any further showing than that embraced in the petition itself, the application for a permit to sell the portion of the capital stock of the applicant in the manner and for the purposes set forth in its said application.

**[4]** The petitioner herein, however, contends that the question as to its right to the issuance of a permit to sell the amount and number of shares of its class "A" common stock as sought by its said application could not, and should not, be solely determined either by the Commissioner or by this court upon the facts above recited, for the reason that the said applicant had set forth in its said application certain other facts relating to its actual or proposed method of conducting its business in relation to the issuance and sale of its aforesaid stock which, if taken to be true as averred in its said application, would have justified the granting of the required permit; and the contention of the petitioner is that in acting upon its said application, taken as a whole, the said Commissioner was bound either to assume the truth of the facts stated therein or to hold a hearing thereon, at

which the applicant might be present to make proof as to the truth of its asserted facts as justifying the issuance of such permit. Assuming, for the sake of the argument only, that the petitioner herein is correct as to thè duty of the Commissioner under such conditions, it becomes necessary to examine the record before us in order to determine whether any such state of facts has been shown to exist which would compel the Commissioner to conduct a hearing in order to have elicited any other facts than those placed within his reach by the averments of said application and which might form a basis for his action in determining to grant or deny the same.— The applicant for such permit set forth therein that "In order that petitioner may receive an adequate consideration" for the issuance of the specific shares of stock to which its said application relates, it has perfected arrangements "(B) That there be surrendered and returned to the treasury of petitioner 30,000 shares of petitioner's Class 'B' stock heretofore issued under a permit from the Commissioner which, on the basis of its dividend earning power as compared with the dividend earning power of said Class 'A' stock would have a par value of $3,000,000.00." Upon the face of this averment in the petitioner's said application two things are apparent: First, that the purpose of the surrender and return of said 30,000 shares of class "B" stock is to recoup *pro tanto* the petitioner for the loss it would sustain from the issuance and sale of its 37,000 shares of class "A" stock to those subscribers therefor who have paid money to said F. G. Cox as the purchase price thereof which by reason of his financial reverses he is unable to either repay to them or to turn over to the corporation, and which deficit, as we have seen, is in excess of $252,000; second, that the 30,000 shares of said class "B" stock which it is thus proposed to have returned to the treasury of the corporation is stock for the issuance of which a previous permit from the Commissioner had been obtained. In view of the size of the aforesaid deficit and of the fact that the Commissioner is expressly referred to the previous permit issued by him for the issuance and sale of said class "B" stock, and in view also of the exact and detailed requirements of the "Corporate Securities Act" as to the showing which must accompany applications for permits for the issuance and sale of corporate

securities, it would be idle to argue that the Commissioner, in determining whether the proposed return and surrender of said 30,000 shares of class "B" stock into the treasury of the corporation would be adequate to wholly or in part recoup said corporation for its said admitted loss, must accept the petitioner's asserted valuation of $3,000,000 placed upon said stock to be so returned and surrendered. He had the indisputable right to examine the records of his own office with relation to this very transaction for the purpose of ascertaining what they disclosed as to the actual value of the stock thus to be surrendered and returned, to ascertain, if you please, whether the sum for which said stock had been permitted to be sold was such as to render it worth $3,000,000 or any considerable part of said sum, for the purpose of determining whether its dividend earning power, as compared with the dividend earning power of said class "A" stock was such as to reasonably give to it the value assigned to it in said application. In view of the fact that the Commissioner was thus referred to said prior application for information already in his possession as to the actual value and dividend earning qualities of this particular body of stock it was at least incumbent upon the applicant to set forth in his application what the records of the Commissioner's own office would disclose in that regard, or, at the very least, to negative in his said application that the Commissioner's said records contained any matter contradicting or casting doubt upon its assertion that said stock so to be returned and surrendered was of the value of $3,000,000. In the absence of any such showing, either in said application or in the petition before us, it would be impossible for this court to determine with respect to this particular statement in the petitioner's application whether the Commissioner, upon recourse to his official record of the previous application for a permit for the issuance and sale of this particular block of the class "B" stock of said corporation to which, by the petitioner itself, he had been referred, did or did not abuse his discretion in refusing his sanction to the applicant's proposal to effectuate a return and surrender of this stock as a total or partial recoupment of the loss it would admittedly suffer by the granting of the present permit. To the petitioner's contention that the Commissioner may not have recourse to the records of his office for whatever

facts these may contain in aid or in opposition to the averments of its application, it may be answered that this immediate inquiry does not involve the question as to whether or not the Commissioner or any other judicial or *quasi*-judicial officer or tribunal may take judicial notice of his or its records as to other cases or transactions than the one immediately before it; but the question is as to whether the Commissioner has the right to refer to his records in relation to the same identical transaction or some portion thereof with respect to which his present action or decision is sought. As to this question we entertain no doubt as to the power and duty of the Commissioner to take into consideration his official records relating to his past action and determination as to any portion of the present matter committed to his discretion.    [5]    The petitioner further sets forth in his said application certain additional facts having relation to its contracts and arrangements with the Doble Laboratories, a California corporation, holding patents covering the motor vehicles or essential portions thereof which petitioner is organized to manufacture and sell, and upon the nature and contents of which depend its business success, corporate fortunes, and the value of its securities to the purchasers and holders thereof.    The petitioner appends to its application what purports to be copies of its several contracts with said corporation, and it may not be doubted that the Commissioner may have reference to these to aid him in determining whether in fact the financial advantages which the petitioner avers will result from the proposed changes therein which these exhibits contemplate would certainly or even probably flow to the petitioner from their consummation. But when reference is had to these several documents it will at once be seen that a very much involved situation is presented concerning which the minds of reasonable men might well differ as to the possibilities of their realization and as to the certainty or probability of any material advantage to flow to this petitioner therefrom.    For example, by reference to exhibit "C" thereof it is found to contain an agreement between another corporation known as Doble Steam Motors and Doble Laboratories for the cancellation of all existing agreements between the parties thereto bearing date prior to May 20, 1924.    It is, however, therein stated that such cancellation is to be conditional upon the negotia-

tion of another contract by which all rights under certain letters patent and inventions now held by said Doble Steam Motors should be vested in the petitioner herein. It is further stated therein that if said Doble Steam Motors is unable to bring about the vesting of said rights in said Doble Steam Motors Corporation, the petitioner herein, then said cancellation agreement shall not apply to that certain agreement between the parties dated February 14, 1922. What this latter agreement is nowhere appears in said application, and hence the value of this proposed conditional cancellation of certain contracts to which this petitioner is not a party is a matter upon which this particular exhibit sheds no light unless such light is to be found reflected from a succeeding agreement also appended to said application and marked exhibit ''D'' and which purports to be an agreement between Doble Laboratories, a California corporation, and Doble Steam Motors Corporation, the petitioner herein. By this agreement Doble Laboratories purports to grant to Doble Steam Motors Corporation a full and exclusive license to manufacture, use, and sell steam motor vehicles and parts thereof under all letters patent now owned or controlled by said Doble Laboratories or which may be thereafter owned and controlled by it. When this agreement is examined in detail it is found to embrace a large number of covenants and conditions, upon the performance of which its own execution and continuance depends. This agreement upon its face and throughout its entire substance is one concerning which reasonable and practical minds might well differ as to the feasibility of its successful execution and as to the ultimate values to flow from it to the petitioner herein. Surely these are matters with respect to which the discretion of the Commissioner is to be exercised, in order to determine whether or not the petitioner has entered or is proposing to enter into a provident contract with relation to the possession and enjoyment of those patent rights in and to either the whole or the essential parts of the particular motor vehicle it is proposing to manufacture and sell and upon which its profits, and hence the present and prospective values of its securities, are to have their only foundation.

[6] But there is another phase of this matter important to be considered in this immediate connection. The application of the petitioner presented to said Commissioner in paragraph

8 thereof refers to a previous application for a permit to issue and sell said stock, dated May 24, 1924. The applicant avers that said application was an "informal application," whatever that may mean, but evidently it was one upon which the Commissioner took action, since the petitioner avers that said Commissioner, through his deputy, "pointed out a number of problems to be settled by said corporation before its application could be favorably considered." The petitioner in its later application, which forms the basis of this proceeding, proceeds to set forth what these problems were as set forth in the Commissioner's response to its former application. It is clear that in harmony with our above holding the Commissioner was, by these specific references to the petitioner's said former application and to the Commissioner's action thereon, entitled to have full access to his records and files embracing said former application and to whatever data these may contain with relation thereto and to the basis for his conclusions and ruling thereon, and particularly to the conditions which he imposed upon the petitioner, compliance with which was made a prerequisite to his favorable consideration of said or any future applications for permits for the issuance and sale of its corporate stock. It nowhere appears in said petitioner's later application, which forms the basis for the present proceeding, what the records and files of the Commissioner's office actually contain as forming a basis or justification for his requirements then imposed, nor is there anything presented before us in either said application or the present petition which tends in any manner to dispute the fact that the said requirements then insisted upon by the Commissioner were not fully justified and entirely reasonable. We must assume them, therefore, to have been such as to each and every of such requirements; and having assumed this, when we look to the further averments of the petitioner's said application having special reference to said requirements, we find that the said petitioner, as to some of these, frankly admits that it has not complied and cannot comply therewith, and as to others of them it shows, instead of actual compliance, a mere promise to comply. For example, the first of said requirements on the part of the Commissioner was, "That the company should immediately get on a substantial production basis in accordance with

statements contained in its former applications.'' In response to this requirement the petitioner appends to its present application exhibit ''E,'' which purports to be a statement of the petitioner's production program for the years 1924 and 1925, and which program the petitioner alleges it ''will in good faith and with due diligence undertake to carry out.'' The exhibit ''E'' that is referred to consists of a report from the production manager of the petitioner to its attorney, optimistic in tone and quite detailed in character; but whether the program of production thus forecast either amounts to such an immediate and ''substantial production basis'' as would satisfy the foregoing requirement of the Commissioner, or whether the same is ''in accordance with statements contained in previous applications,'' were matters which were necessarily committed to his discretion, and to a discretion in the exercise of which he was entitled to have access to all of the records and files of his office having relation not only to this particular requirement, but also to such former applications of the petitioner for permits to issue and sell stock as were predicated upon production. It is nowhere shown, either in its said application or in the petition herein, that the Commissioner abused his discretion in making said requirement or that he is now abusing it in refusing to issue the presently sought permit until a substantial compliance with it has been shown. Again, the Commissioner, among said requirements, compliance with which was essential to be shown before further permits to issue or sell stock were to be granted, included the requirement ''That the patents essential to the manufacture of the Doble car should immediately be transferred to the above company and that in the event royalties were to be paid they should only be paid out of net profits.'' The petitioner herein asserts in his said application that this condition has been completely complied with by the contract with the Doble Laboratories set forth in exhibit ''D'' to its said application, but the Commissioner was entitled to examine and interpret said contract as contained in said exhibit ''D'' to determine whether said assertion was true. From our own examination of said contract we are frank to say that the interpretation of said contract as to its sufficiency to meet and fulfill the aforesaid requirement of the Commissioner is one upon which the minds of reasonable

men might fairly differ, and this being so, the Commissioner, in the exercise of the discretion with which he was invested, was entitled to conclude that said contract did not suffice to meet and fulfill his said requirement, and that in the absence of either averment or showing as to any abuse of his said discretion his determination upon that subject would be conclusive. We might pursue this subject further and with reference to a number of other matters set forth in the petitioner's said application and repeated in its petition herein; but sufficient has been said to show that as to many if not most of the matters contained in these two documents there appears upon the face of each of them enough to call for the exercise on the part of said Commissioner of a *quasi*-judicial discretion as to whether the permit asked for should be granted or denied; and that as to those matters and things set forth in said petition which refer directly to the action of the Commissioner upon former applications and proceedings before him having a direct bearing upon the facts and conditions to be considered by him in granting or denying the present application he was entitled to refer to such former applications and proceedings and to his action thereon for such further facts in addition to those appearing upon the face of the present application as would inform his judgment as to the wisdom and propriety of granting or of denying the same. This being so and no error or abuse being shown in the exercise by the Commissioner of such discretion, the demurrer to the petition herein must be sustained; and since the matters herein referred to are matters appearing on the face of the petitioner's application before the Commissioner and are, therefore, not susceptible of amendment, it follows that the petition herein must be denied and the alternative writ discharged, and it is so ordered.

Myers, C. J., Lawlor, J., Shenk, J., Waste, J., Lennon, J., and Seawell, J., concurred.