[S. F. No. 16852.   In Bank.   Aug. 18, 1944.]

BUNNY'S WAFFLE SHOP, INC. (a Corporation) et al.,
   Petitioners, v. CALIFORNIA EMPLOYMENT COM-
   MISSION et al., Respondents; MITCHELL VEZILICH
   et al., Interveners and Respondents.

Brobeck, Phleger & Harrison, Gregory A. Harrison, George O. Bahrs, James L. Feely and Richard Ernst for Petitioners.

Robert W. Kenny, Attorney General, John J. Dailey, Deputy Attorney General, Forrest M. Hill, Charles P. Scully, Gladstein, Grossman, Margolis & Sawyer, Ben Margolis and William Murrish for Respondents.

TRAYNOR, J.—In this proceeding certain San Francisco restaurant operators seek a writ of mandamus to compel the California Employment Commission to vacate its decisions ordering the payment of unemployment insurance benefits to petitioners' employees during July and August, 1941. Before that time the various local unions of the Hotel and Restaurant Employees' International Alliance & Bartenders' International League of America dealt only with individual

employers. It was the general practice for the local Joint Executive Board that represented the local unions to distribute cards to each employer upon which were printed the wage scales and conditions of work prescribed by the unions. If the employer agreed to abide by these terms he was given a display card to indicate that he was operating under union conditions, but there was no written collective bargaining agreement. In February, 1941, the unions issued new cards providing for more favorable conditions of work. Shortly thereafter, a number of the restaurant operators, including petitioners, joined the San Francisco Employers' Council for the purpose of bargaining collectively with their employees as to wages, hours and conditions of work. On May 6, 1941, the Employers' Council notified the Joint Board that it represented a number of the restaurants and wished to negotiate a single contract on their behalf. It stated that the terms of employment prescribed in the new shop cards were unacceptable and requested that a committee representing the unions meet with the employers' representatives for the purpose of bargaining collectively. The Joint Board refused this request and indicated that it would continue as before to prescribe terms and conditions of work. On May 19, 1941, the Employers' Council notified the Joint Board and the unions comprising it that the restaurants represented by the council intended to cancel all contracts with the unions as of June 30, 1941, unless such contracts were extended by mutual agreement pending further joint negotiations and that in the event of such cancellation, the restaurants would thereafter operate under terms deemed by the owners thereof to be essential to the continued operation of their places of business. When union representatives subsequently requested individual restaurants represented by the Employers' Council to sign individual agreements embodying the conditions of employment demanded by the unions, the restaurant operators referred them to the Employers' Council as their designated collective bargaining agent. The unions refused to deal with the Employers' Council, claiming that it represented only 67 of the 2,000 restaurants doing business in San Francisco. The representatives of the Joint Board nevertheless held one token meeting with the employers and subsequently offered to sign a master contract identical in terms with the unions' shop cards. At about the time of this proposal, the unions obtained

sanction from the San Francisco Central Labor Council to strike two of the restaurants that had joined the Employers' Council, but this sanction was never used. On July 1, 1941, the employers submitted a proposed collective bargaining agreement to the Joint Board and offered to continue operations on the old terms pending negotiations. The unions rejected this proposal, reiterating their demand for individual agreements for more favorable conditions of work, and on that day directed employees of one of the restaurants to strike if the owner refused to sign such an agreement. The following day the restaurant owners' policy committee met and formulated a plan of action, and on July 3, 1941, the employers posted notices in their establishments that until the Joint Board and the unions agreed to negotiate collectively, wages would be reduced to 75 per cent of the previous rate, a six day week would replace the prevailing five day week, and split shifts instead of straight shifts would apply to all culinary workers. The unions, however, instructed their members to continue working. On Monday, July 7th, and Tuesday, July 8, 1941, most of the employers who had posted the notice paid their employees at the new rate. A number of the employees thereupon quit their work because of the cut in their wages and the employers subsequently closed their places of business. On Tuesday, July 8, 1941, the employers decided to close all their establishments at the end of that business day. No strike was ever declared and a number of the claimants herein were not on duty at the time the wages were paid at the new rate and the restaurants closed, but found their places of employment closed when they returned to work or did not report for work because they had heard of the closing.

The initial determinations of the adjustment bureau of the commission denied benefits upon the ground that claimants were disqualified under section 56(a) of the Unemployment Insurance Act. (Stats. 1935, p. 1226 as amended; 2 Deering's Gen. Laws, 1937, Act 8780d, § 56(a).) The cases were consolidated for hearing before the referee, who denied benefits to some claimants but granted them to others. There were also consolidated hearings before the commission, which, with one member absent and one dissenting, awarded benefits to claimants. It held that the employers' imposition of a split shift, a six-day week, a twenty-five per cent cut in wages, and a uniform pay-day, for the sole purpose of compelling the em-

ployees to bargain collectively with this group of employers was tantamount to a lockout, that the employees consequently left work as the result of the employers' acts and not voluntarily and that they were therefore not disqualified under section 56(a) of the act. Certain employers thereupon petitioned the District Court of Appeal, First Appellate District, Division Two, for a writ of mandamus to compel the commission to set aside its decisions, to deny payment of the benefits, and to refrain from making any entries charging petitioners' accounts with such benefits. The district court issued an alternative writ and restrained the commission from taking further proceedings in the matter, but before the case was heard it was transferred to this court. The claimants appear as interveners in these proceedings.

The basic facts underlying the present controversy are undisputed, and although the facts differ as to particular claimants, petitioners have regarded the case as involving only workers who left their jobs because their employers substantially reduced wages and imposed less favorable conditions of work, and base their claim for relief solely upon alleged errors of law in the commission's interpretation of section 56(a) as permitting the award of benefits to such workers. As this factual case is the most favorable one they can present and does not warrant the issuance of the writ, it is unnecessary to inquire into the facts of each claim.

Petitioners contend that the claimants are clearly within the disqualification of section 56(a), which declares an individual ineligible for benefits "If he left his work because of a trade dispute. . . ." (2 Deering's Gen. Laws, 1937, Act 8780d, § 56(a).) They reason that there was no lockout in the present case because they did not shut down their places of business and refuse work to their employees to compel acceptance of terms and conditions of employment (*cf. Barnes* v. *Hall*, 285 Ky. 160 [146 S.W.2d 929, 936-937]), that the claimants could have continued working either at the reduced wages or at the regular wages had they consented to bargain collectively with the employers' representative, and that their leaving was therefore a voluntary act bringing them within the disqualification of section 56(a). (See *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935].)

The commission's decision apparently is based upon the conclusion that the leaving of work was not voluntary, but

it also found that the leaving was attributable to the employers' changes in wages and conditions of work, to continue in effect until the unions would negotiate with them. Petitioners do not question this finding but contend that their acts were but an additional step in a trade dispute, and that when claimants left their work because of such acts, they left because of a trade dispute and are therefore not eligible for benefits. This reasoning fails to distinguish between leaving in the course of a trade dispute and leaving because of a trade dispute. The act does not disqualify an employee from receiving benefits in all cases where his unemployment results directly or indirectly from a labor dispute, but makes him ineligible only if he left his work because of the dispute. There must therefore be a direct causal connection between the trade dispute and the leaving of work. It is conceded that when claimants ceased working, a trade dispute between the unions and employers was in active progress, but this fact alone does not necessarily establish that the leaving was because of the trade dispute. The commission found that the leaving was caused by the reduction in wages and the changed conditions of work, which the employers declared would continue in effect until the unions agreed to negotiate with them.

Although wages and conditions of work are normally subjects of labor disputes, the facts in the present case and the proviso attached by the employers to the changes made, clearly show that those changes were not the subject of a trade dispute in this case. A bona fide labor dispute between the employers and the unions existed for several months before these changes were announced. In the course of that dispute the unions were demanding more favorable terms and conditions of employment and individual contracts with the employers, while the employers were demanding that the old terms and conditions be continued and that the unions bargain collectively with their representative. There was no suggestion during this entire period that wages be reduced or more onerous conditions of work be imposed, or even that the employers wished such changes. Consequently there was no dispute concerning these matters. When the new conditions of work were finally announced by the employers, they were not offered as bona fide proposals for the continued operation of the employers' places of business, but were imposed for the sole purpose of coercing the unions into bargaining collec-

tively with the employers' representative and were to continue only until the unions agreed to do so. Admittedly they were an economic weapon designed to compel compliance with the employers' demands, and when claimants left their work, they left because of this economic weapon and not because of the trade dispute then in existence. The fact that the trade dispute was unquestionably the motivating cause of the employers' acts does not establish any direct causal relation between the dispute and the employees' leaving of work. (See *Rhea Mfg. Co.* v. *Industrial Com.*, 231 Wis. 643 [285 N.W. 749, 753].)

Petitioners attempt to liken their action to that of the union in obtaining a strike sanction, striking a single member of a collective bargaining unit, or establishing a picket line. ■ A strike sanction, however, merely indicates approval by a central union agency of a possible strike and is primarily a threat of economic action. ■ A strike against a single member of an employers' collective bargaining unit involves economic action against that employer only and subjects to disqualification under the Unemployment Insurance Act those employees only who leave their work because of the dispute. If the other employers thereupon choose to close their establishments and lock out their employees, such employees cannot be charged with leaving their work because of a trade dispute. The threat of possible economic action involved in a strike upon one of a group of employers or in obtaining strike sanction bears no analogy to the employers' act in the present case, for the latter culminated in actual economic action against the employees that caused them to leave their work. The employers' acts are likewise distinguishable from notice to an employer that a strike against him will begin at a specific time. (*Cf. Employees of Utah Fuel Co.* v. *Industrial Com.*, 99 Utah 88 [104 P.2d 197, 200].) ■ Nor is there an analogy between the employers' acts and the establishment of a picket line. They contend that the decision in the Bodinson case (17 Cal.2d 321) that one who leaves work because of a picket line leaves because of a trade dispute within the meaning of section 56(a), precludes a distinction between leaving work because of the dispute and leaving work because of a weapon used in the dispute. The emphasis in that case, however, was upon the meaning of the word "left"

in the phrase ''left his work,'' and no question was raised as to any lack of causal relation between the leaving and the trade dispute. A picket line, moreover, is an economic weapon directed against the employer by a union and recognition of it by a fellow worker amounts in effect to participation by him in the trade dispute it represents. (*In re Persons Employed at St. Paul & Tacoma Lumber Co.,* 7 Wn.2d 580 [110 P.2d 877, 884]; *Andreas* v. *Bates,* 14 Wn.2d 322 [128 P.2d 300, 308].) The economic weapon in the present case was created by the employers and directed against their employees, and it alone, rather than the trade dispute that occasioned it, was the cause of the leaving of work.

Petitioners cite a number of cases from various states holding coal miners ineligible for benefits upon the ground that their unemployment was owing to a labor dispute because they refused to work until a contract with their employers in process of negotiation was signed or a satisfactory interim arrangement agreed upon. (*Block Coal & Coke Co.* v. *United Mine Workers,* 177 Tenn. 247 [148 S.W.2d 364, 149 S.W.2d 469]; *Barnes* v. *Hall,* 285 Ky. 160 [146 S.W.2d 929]; *Miners in General Group* v. *Hix,* 123 W.Va. 637 [17 S.E.2d 810]; *Dallas Fuel Co.* v. *Horne,* 230 Iowa 1148 [300 N.W. 303]; *Department of Industrial Relations* v. *Pesnell,* 29 Ala.App. 528 [199 So. 720]; *Ex parte Pesnell,* 240 Ala. 457 [199 So. 726]; *Walter Bledsoe Coal Co.* v. *Review Board,* —— Ind. —— [46 N.E.2d 477]; see *Sandoval* v. *Industrial Com.,* 110 Colo. 108 [130 P.2d 930].) In those cases, however, the cause of the unemployment was the inability of the employers and the unions to agree upon terms and conditions of employment to be embodied in a new contract or an interim agreement, rather than economic action taken by the employer.

The finding of the commission as to the cause of claimant's leaving of work in the present case was one that it was entitled to make under the facts. (*Johnson* v. *Pratt,* 200 S.C. 315, 332-344 [20 S.E.2d 865, 871-872].) This finding rejects the trade dispute as the cause of such leaving and is sufficient to support the award of benefits.

Had claimants in the present case left their work because of the trade dispute, the merits of the controversy would be immaterial and there would be no occasion to inquire whether they had good cause for leaving. (See *W. R. Grace & Co.* v.

*California Employment Com., ante*, p. 720 [151 P.2d 215] ; *Dallas Fuel Co.* v. *Horne*, 230 Iowa 1148, 1154 [300 N.W. 303, 306] ; *Deshler Broom Factory* v. *Kinney*, 140 Neb. 889 [2 N.W.2d 332] ; *In re Steelman*, 219 N.C. 306, 312 [13 S.E.2d 544, 548] ; *Johnson* v. *Pratt*, 200 S.C. 315, 334 [20 S.E.2d 865, 872].) ▮ Since claimants are not ineligible for benefits under the provisions of section 56(a), however, the question arises whether, if they left their work voluntarily, they are subject to the temporary disqualification imposed by section 58(a) of the act upon one who ''left his most recent work voluntarily without good cause, if so found by the commission. . . .'' (Deering's Gen. Laws, 1939 Supp., Act 8780d, § 58(a) ; Stats. 1939, ch. 674, § 14.) The commission found that a twenty-five per cent wage cut imposed upon a single worker would give him good cause for leaving his work. A substantial reduction in earnings is generally regarded as good cause for leaving employment (3 C.C.H. Unemployment Insurance Service 24,054 par. 1975.013 [Mass.] ; 4 *Ibid.*, 30,040, par. 1975.033 [Nebr.App.Trib.Dec., App.Doc. No. 238, 4/10/40] ; 4 *Ibid,* 32,033, par. 1975.027 [N.H.App.Trib.Dec. App. No. 5-7499, 9/9/38] ; 4 *Ibid.* 33,055, par. 1975.021 [N.J. Bd.ofRev. Decs. Nos. BR-35,539] ; 5 *Ibid.* 38,056, par. 1975.013 [Oh.Ref.Dec., 1605-Ref-41, 3/26/41] ; 5 *Ibid.* 38,157, par. 1975.033 [Oh.Bd.ofRev.Dec., 11 BR-41, 1/31/40] ; 5 *Ibid.* 42,502, par. 8030.02 [R.I.App. No. 1640, 2/5/42] ; 6 *Ibid.* 46,053, par. 1975.01 [Texas 1598-AT-40, 10/2/40]), and the commission acted properly in so holding in the present case. (See *Doble Steam Motors Corp.* v. *Daugherty*, 195 Cal. 158, 164-166 [232 P. 140] ; *McDonough* v. *Goodcell*, 13 Cal.2d 741, 748-749 [91 P.2d 1035, 123 A.L.R. 1205] ; *Bank of Italy* v. *Johnson*, 200 Cal. 1, 16 [251 P. 784] ; *Shields* v. *Utah Idaho C. R. Co.*, 305 U.S. 177, 185 [59 S.Ct. 160, 83 L.Ed. 111].) Since the reduction in wages was not the subject of a labor dispute, the fact that it was imposed upon all petitioners' employees instead of only upon a single one does not preclude it from being good cause for leaving for each of them. An employer cannot effect the disqualification of his employees with regard to unemployment insurance benefits by giving all of them instead of just one, good cause for leaving. (*Cf.*

*Deshler Broom Factory* v. *Kinney,* 140 Neb. 889 [2 N.W.2d 332].)

The alternative writ is discharged and the peremptory writ is denied.

Gibson, C. J., Shenk, J., Curtis, J., and Edmonds, J., concurred. Carter, J., and Schauer, J., concurred in the judgment.