115 So.2d 119

**The ANDALA COMPANY**

**v.**

**Evelyn Chavers GANUS et al.**

**4 Div. 344.**

Court of Appeals of Alabama.

June 17, 1958.

Rehearing Denied Aug. 19, 1958.

Reversed on Mandate Oct. 20, 1959.

Albritton & Rankin, Andalusia, for appellant.

Edward H. Brogden, Jr., Andalusia, J. Eugene Foster and Richard S. Brooks, Montgomery, for Dept. of Industrial Relations.

PRICE, Judge.

This appeal is from a judgment of the Circuit Court of Covington County awarding claimant, appellee, unemployment compensation.

The Claims Examiner of the Department of Industrial Relations denied the claim, but his determination was reversed by the Appeals Tribunal and benefits awarded. The decision of the Appeals Tribunal was affirmed by the Board of Appeals. The Alabama Department of Industrial Relations has appeared by counsel and presented briefs and arguments to support the award.

It is stipulated that the only question involved is whether claimant "left her employment voluntarily without good cause connected with such work." Subsection B of Section 214, Title 26, Code 1940 as amended.

Appellee, Mrs. Evelyn Chavers Ganus, was employed by appellant, The Andala Company, a textile mill, for approximately eleven years. For the past four years she performed the job of sewing machine operator, with the specific task of sewing zippers on flies for pants. She was the only employee doing this type sewing. Her daily average was 170 to 176 dozen zippers for an eight hour day. Her earnings were $1 or more per hour and her average pay was not less than $42 per week for forty hours work. The minimum hourly pay rate under the Wage and Hour Law was 75¢ per hour.

Claimant left her employment on October 13, 1954. A short time prior thereto, the company retained an engineering firm to make a study of its job operations. As a result of this study the method of sewing done by claimant was changed. Prior to the change the zipper was sewn from bottom to top, but after the change it was sewn from top to bottom. The type of zipper was also changed. Claimant admitted that some of the changes were helpful toward increasing production, such as lengthening the stitch, which would speed up the sewing to a certain extent, and that the method of clipping was improved.

The piece rate was changed from .0405¢ per dozen, or $4.05 per hundred dozen, to .0224¢ per dozen, or $2.24 per one hundred dozen.

A five weeks retraining period was set up during which claimant was to unlearn the former sewing techniques and learn to adjust to the new methods brought on by the changes.

It was stipulated between the parties that change in the production methods was to begin on October 1, 1954, and that Mrs. Ganus would be guaranteed the hourly rate based on previous earnings for the remaining working days of that week. The second week of the training period the pay would

be .0374¢ per dozen; for the next week .0280¢; the next .0248¢; the next .0235¢. At the end of the five week retraining period the rate thereafter would be established at .0224¢ per dozen.

The piece rate, under the change, was reduced about half the amount claimant had been receiving, and in order to earn the same wages after the change that she previously earned, she would be required to sew almost twice the number of zippers she had previously sewn.

Claimant worked two weeks under the new arrangement. Her testimony was that she worked harder those two weeks than she did the rest of the time she had worked there, in an effort to give the new setup a fair trial.

The week the pay rate was set at .0374¢ per dozen Mrs. Ganus only earned $21.80, but because of the minimum wage law she was paid $30.98. She asked for a new machine but her request was denied. She also asked for a different job assignment, but was told that no other job was available.

Claimant admitted that she would have received 75¢ per hour under the provisions of the Minimum Wage and Hour Law in effect at that time, whether or not she made production. However, during all the years of her employment she had never failed to make production on any job assigned to her and had she failed to reach production it would have been entered against her record and the employer "would nag you every day about not making the 75¢ an hour and you would have to go down and talk to somebody if you didn't make it." The last day she worked her supervisor "asked me if I wasn't ashamed of that make-up down there, and I said I understood that it wasn't going to be make up, and she said, well it is and it is going down like that."

Before she quit claimant talked with the engineer responsible for the change to ascertain if the reduced piece rate was to be permanent and was assured that it would be permanent. Claimant admitted she voluntarily quit her job and that her only reason for quitting was the reduction in piece rate from .0405¢ to .0224¢.

The company offered testimony to show that the purpose of the engineering study, "is to reduce the cost of making the garment in order to meet competition. * * * The whole point is to increase the amount of garments produced at less cost to the company but without reducing the wages paid to the employee. This is done by new methods and new techniques of operation." The engineering study applied to all operators throughout the plant and was not confined to zipper fasteners or any one operation, but applied to all operators.

The engineer making the study explained in detail the old and new methods of sewing zippers and stated the purpose of the change in operation was to increase numerically the production of garments and at the same time not to decrease the amount of money the operator was making.

The company offered testimony to show that after claimant quit work another operator was assigned to the job. This employee was an experienced top cord pants operator who had been using a one needle plain sewing machine. She had had no previous experience as a zipper fastener. This operator showed a material increase in production. After five weeks, in one 8 hour day she produced 270 dozen; another day in the same week 286 dozen; for seven hours work another day 200 dozen; 96 on another 7 hour day. She has done as many as 320 dozen in one day and if she works 8 hours she can average at least 318 dozen.

Claimant's supervisor, Mary Braxton, testified that in her opinion if Mrs. Ganus had completed the five weeks training period and had tried to adopt the new methods and techniques installed she would have achieved a production which would have given her the same pay she was receiving prior to the change. She stated that although Mrs. Ganus stayed at her machine and appeared to be working, she appeared very much upset and in such a frame of mind about the change in the piece rate "un-

til I knew we wasn't getting the best out of her." She also said that under the new setup an operator would have to produce almost twice as many items to get the same pay she would have received under the old scale.

■ "A substantial reduction in earnings is generally regarded as good cause for leaving one's employment, and, hence, one who leaves for such reason is not disqualified for unemployment compensation on the ground of leaving his work voluntarily without good cause; but in this connection the surrounding circumstances should be considered in determining whether a particular reduction in pay constitutes good cause for leaving one's employment." 81 C.J.S. Social Security and Public Welfare § 170, p. 258. See also Alabama Textile Products Corporation v. Rodgers, 38 Ala.App. 206, 82 So.2d 267.

In Bunny's Waffle Shop v. California Employment Commission, 24 Cal.2d 735, 151 P.2d 224, 228, the court upheld the determination of the commission that the employers' imposition of a split shift, a six day week, a 25 per cent cut in wages and a uniform pay day, for the sole purpose of compelling the employees to bargain collectively with that group of employers, was tantamount to a lockout, and that the employers left work because of the employers' acts and not voluntarily and that they were not disqualified from receiving unemployment benefits. The court said: "The commission found that a twenty-five per cent wage cut imposed upon a single worker would give him good cause for leaving his work. A substantial reduction in earnings is generally regarded as good cause for leaving employment. * * * And the commission acted properly in so holding in the present case."

We are of opinion that under the facts and circumstances shown here the almost fifty per cent reduction in claimant's wages during a time of static wage levels, constituted good cause for leaving her employment and that she is not disqualified for unemployment benefits on the ground that

she left her employment "without good cause connected with such work."

■ That part of the trial court's judgment finding Evelyn Chavers Ganus entitled to recover unemployment compensation benefits is affirmed.

That part of the judgment providing that claimant "have judgment against the appellant for unemployment compensation in the amount fixed by law" is reversed. Alabama Mills v. Carnley, 35 Ala.App. 46, 44 So.2d 622, 14 A.L.R.2d 1301.

The court further directed, "That the Alabama Department of Industrial Relations determine the amount of unemployment compensation which the appellee is entitled to receive, said determination and calculation to be in the sum fixed by law, and pay the same to her, covering past amounts due and future installments."

All of the amounts to which claimant is entitled are now past due, and we deem it advisable for the court to ascertain and determine the amount of compensation due and order the same paid as provided by Section 205, Title 26, Code, in accordance with the decision of this court in Alabama Mills v. Carnley, supra.

With this correction the judgment below is ordered affirmed.

Affirmed.

On Rehearing

Appellant requests that we extend our opinion to include the following statement of fact:

The engineer making the study of job operations and piece rate adjustments testified: "Our primary purpose is to reduce the cost of making the garment to compete with Alatex. In doing so it is our desire to reduce the cost and yet not hurt earnings. In fact 99 per cent of the cases the operator earnings will increase. When I say 'not hurt earnings' I mean not hurt the earnings of the operator. We reduce the cost of making the garment, but not at the

expense of the operator. This is brought about by new and improved methods, new and improved equipment, and way of handling the work, set ups, which would be their work place, and methods at the set ups. In many cases it will invoke a garment construction change. The whole point 'is to increase' the amount of garments produced at less cost to the company, but without reducing the wages paid to the employees. This is done by new methods and new techniques and operation."

The witness further testified the basic hourly pay rate to which the piece rate of .0405 was geared was 89¢ per hour, and that the new piece rate of .0224 was based on the same 89¢ hourly rate. The piece rates are geared to this basic hourly rate based on time and motion studies.

"What happens, we make a time study, we will time everything that the girl does, what we call clipping a coupon, it takes maybe a tenth of a minute to clip a coupon and we will time it, and through a series of mathematical computations, add them up and apply our allowances and divide into the number of minutes per day and that will give us our standard dozens and what is expected of the average operator in eight hours, then you would divide that figure into the base pay, which will give our cents per dozen."

We are also requested to set out the testimony of this witness related in the following questions and answers:

"Q. Now then, in this particular case this lady would have to do roughly twice as much work under the new program to equal her pay under the old program, *us* that right? A. She would have to do less work. The way we look at it she would have to turn out twice as many dozens.

"Q. That's what I mean, she would have to turn out roughly twice as many dozen to equal the pay she was making before the survey came in? A. Yes.

"The Court: In other words, twice as many dozen but with less exertion on her part, is that what you mean? A. That's exactly right.

"Q. Reduce the operation in exertion and at the same time increase the production? A. Yes, sir.

"The Court: That is what you contend about it? In other words, that is what the survey was made for? A. That's right."

We are further requested to set out the statement of the witness that on the jobs done by his firm the techniques for the zipper fastener operation recommended under the engineering program were his firm's recommendation for the maximum production without increasing the exertion of the operator and without decreasing her pay, and that his method of operation is designed to achieve an equal earning or better for the operator.

Opinion corrected and extended.

Application overruled.

PER CURIAM.

Reversed and remanded on authority of Andala Co. v. Ganus, 4 Div. 975, 269 Ala. 571, 115 So.2d 123.