15406

JOHNSON *ET AL.* v. PRATT *ET AL.*

(20 S. E. (2d), 865)

318

June, 1941.

*Mr. Thomas H. Pope, Jr., Mr. W. M. Capers, Mr. Robert G. Horine,* and *Messrs. Elliott, McLain, Wardlaw & Elliott,* all of Columbia, counsel for appellants,

*Mr. John W. Crews,* of Columbia, *Mr. Isadore Katz* and *Mr. David Jaffe,* both of New York City, counsel for respondents,

322

May 8, 1942.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BONHAM.

This case comes before the Court under the provisions of the South Carolina Unemployment Compensation Law, enacted by the General Assembly of this State and approved on the 6th day of June, 1936, (Acts, S. C., 1936, 39 St. at Large, page 1716), as amended by the General Assembly by an Act approved on the 30th day of June, 1939 (Acts, S. C., 1939, 41 St. at Large, page 487), with particular reference to Section 5 (d) (1) and (2). We quote from the Acts of 1939 at pages 490 and 492:

"Section 5. An individual shall be ineligible for bene-fits: * * *

"(d) For any week with respect to which the commission finds that his total or partial unemployment is directly due to a labor dispute in active progress in the factory, establishment or other premises at which he is or was last employed; Provided that this subsection shall not apply if it is shown to the satisfaction of the commission that:

"(1) He is not participating in or financing, or directly interested in such labor dispute; and

"(2) He does not belong to a grade or class of workers of which, immediately before he became unemployed by reason of such dispute, there were members employed at the premises at which the dispute exists, any of whom are participating in or directly interested in such dispute.

"Provided, Further, That if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall for the purpose of this subsection be deemed to be a separate factory, establishment or other premises."

Section 6 (i) of the Act of 1939 (page 495), provides for review by the Courts of decisions of the Act as to the

payment of benefits to unemployed individuals, and the case comes to this Court under the provisions on this subsection.

The respondents, group test claimants representing employees of the Pacific Mills, Hampton Division, Columbia. South Carolina, other than employees of the Capital City plant and doffers of the Hampton Division, brought this action against the South Carolina Unemployment Compensation Commission and Pacific Mills, Hampton Division. The object of the action was to determine whether the commission erred in denying unemployment compensation benefits to the employees in question for a period of unemployment beginning on or about September 16, 1940. Claims filed therefor were disallowed as to these employees by the commission in its initial determination, dated November 9, 1940, because they were found to be unemployed directly because of an active labor dispute on the premises where they were employed in which members of a grade or class of employees to whom they belonged were participating and directly interested. The initial determination was appealed to the appeal tribunal by the claimants. The commission in its appellate capacity removed the appeal unto itself. Subsequently arguments of counsel for the claimants and for the company were heard. The company contended that the initial determination was erroneous only as to the employees of the Capital City plant. Therefore, the commission's decision was issued, in and by which the initial determination was affirmed in all respects.

On or about the 20th day of December, 1940, the claimants filed a petition for a judicial review of that part of the decision of the commission denying unemployment compensation benefits to the employees of the Olympia, Granby, and Richland plants. The claimants, in appealing to the Court of Common Pleas, took issue with the decision of the commission and denied, first, that their unemployment was directly due to a labor dispute in active progress in each of the plants where they worked, and denied, second, that they belonged

to·a grade or class of workers members of which participated in or were directly interested in such labor dispute. The claimants further alleged that in some thirteen particulars the commission erred in its findings of fact upon the evidence, and that it erred in not properly defining, interpreting, and applying the pertinent sections of the South Carolina Unemployment Compensation Law, which sections we have already quoted in this opinion.

The commission duly filed its answer, and, as required by law, certified to and filed with the Court all documents, papers, and testimony taken in the action.

The commission, by its answer, denied the thirteen allegations of error contained in the complaint. For a second defense, the commission alleged that it had found, as a matter of fact, that claimants were not entitled to benefits under the foregoing provisions of the Act; that it had found, as a matter of fact, that a labor dispute was in existence in each of the three mills at which claimants and the workers whom they represent were employed; that it had found, as a matter of fact, that claimants and the workers whom they represented were unemployed as a direct result of such labor dispute; and that the plaintiffs and the workers whom they represent had failed to show to the satisfaction of the commission that they were not members of a grade or class of workers members of which were employed at the premises at which the dispute existed and who were participating in or directly interested in such labor dispute. For a third defense, the commission alleged that all findings of fact by the commission were supported by the evidence, 'and that such findings of fact were conclusive; and that the defendants had properly interpreted the pertinent provisions of the Act, and that the claimants were not entitled to benefits thereunder.

The case came on for hearing before the Honorable William H. Grimball, presiding Judge, on May 5, 1941, at which time arguments of counsel were heard. By his decree, dated

June 27, 1941, his Honor ordered that the final determination of the commission be set aside, and that the commission pay to the claimants, and those whom they represent, unemployment compensation benefits. From this decree the defendants, in due time, gave notice of intention to appeal, and the case comes before this Court on their twelve exceptions, which resolve themselves, in our opinion, and in the statements of "questions involved" in the briefs of all parties herein, into three questions for our determination:

"1. Was the finding by the commission that a labor dispute existed at the Hampton Division, Pacific Mills, Columbia, South Carolina, a finding of fact by the Commission that could not be disturbed by the Court on appeal?

"2. Was there a labor dispute existing within the meaning of Section 5(d) of the South Carolina Unemployment Compensation Act at the Hampton Division, Pacific Mills, Columbia, South Carolina, and were the claimants and those whom they represent unemployed directly as a result thereof?

"3. Did the claimants and those whom they represent belong to a grade or class of workers of which there were members employed at the premises at which the dispute existed any of whom participated in or were directly interested in said dispute?"

It is uncontradicted that the Pacific Mills has a division known as the Hampton Division, in Columbia, South Carolina; that this operation consists of four plants, namely, Olympia, Granby, Richland, and Capital City, employing more than two thousand workers; that prior to Monday, September 16, 1940, the Pacific Manufacturing Company rearranged the work load in the above-named four plants which rearrangement was to take effect on Monday, September 16, 1940; that the change had the effect of increasing the work load of a majority of the processing employees in the four plants; that the management, prior to the effective date, discussed this rearrangement with the shop

committee and representatives of the Textile Workers Union of America, the collective bargaining agent for the employees; that Local No. 254 of the Textile Workers Union of America held a special meeting on Sunday, September 15, 1940, discussed the new work load, and voted to try it, with the understanding that the division of conciliation of the United States Department of Labor would have present, as soon as possible thereafter, a technical expert to observe the work load requirements; that following the meeting of the union on Sunday, September 15, 1940, the doffers held a meeting and decided not to abide by the vote of the majority at the union meeting, and not to report for work on the next morning; that on the following day the spinning doffers did not report for work on the first, second and third shifts at the Olympia plant, nor did the spinning doffers at the Richland plant report for work on any of the three shifts; that the battery fillers at the Richland plant walked out of the weave room on Tuesday, September 17th, at nine o'clock in the morning, these workers being employed on the first shift; that the second and third shift battery fillers did not report for work at the Richland plant on September 17th; that at the Granby plant, the fly frame hands on the second shift, who had worked on Monday, walked out of the plant on Tuesday afternoon, September 17th; that the fly frame hands on the third shift did not report for work on Tuesday, and neither did the fly frame hands on the first shift report for work on Wednesday, September 18th. At the Granby plant, the bobbin cleaning hand did not report for work on the second and third shifts on Tuesday, September 17th, nor on the first shift on Wednesday, September 18th. The Olympia plant operated until nine o'clock on the morning of September 16th, and unsuccessful attempts were made to resume work at the time of the commencement of the second and third shifts. The Richland plant closed down at nine o'clock on the morning of September 17th, while

operations at the Granby plant ceased at eleven o'clock that night.

The Capital City plant closed on September 17th, due to the fact that the Richland plant could not use its products because operations had ceased at-the latter. All Capital City hands reported for work. The commission found that those workers were not ineligible for benefits, this finding being predicated upon the ground that the Capital City employees were workers in a separate factory engaged in a separate business conducted on separate premises under the proviso to Section 5(d). The company did not file a petition for a judicial review of the decision of the commission insofar as concerned the allowance of benefits to the employees of the Capital City plant, and that question is therefore not before this Court for determination.

It is also uncontradicted that the claimants, and those whom they represent, are all textile workers, all of whom, immediately before they became unemployed, were employees of the Pacific Mills, Hampton Division, in Columbia, South Carolina. It is further uncontradicted that the workers who quit voluntarily were all employees of the said mills, Hampton Division, in Columbia, immediately before they became unemployed, and that all of the said employees who voluntarily quit were textile workers therein. It is also undisputed that the issue between the company and the textile workers who did not report for work on the dates indicated was the rearrangement in the work load in the four named plants, in some one of which each of the textile workers (those who quit and those who did not) was employed. immediately prior to September 16, 1940.

The first question before us is: Was the finding by the commission that a labor dispute existed at the Hampton Division, Pacific Mills, in Columbia, a finding of fact by the commission that could not be disturbed by the Court on appeal? The answer to this question involves the determination of whether the commission was justified in finding, as

a matter of fact, that a labor dispute existed at that time and place.

There was testimony before the commission that the Pacific Manufacturing Company had announced a rearranged work load which affected the majority of the workers in the three plants under discussion, and that negotiations, respecting this new schedule, had been held between the company and the Textile Workers Union of America, regarding a contract for trying out the new work load; that a discussion was held by the employer with the shop committee and representatives of the bargaining agent; that the proposal was discussed at a special meeting of the local union on Sunday, September 15, 1940. At this meeting it was decided to try the proposed schedule, but at a subsequent meeting of the doffers, it was decided that the latter workers would not abide by the new plan; and that on September 16th, 17th, and 18th, various textile employees, who had held essential positions in these three plants, either walked out or failed to report for duty. It is admitted that the doffers decided not to report for work because they did not approve of the new work load. The battery fillers, the fly frame hands and the bobbin cleaning hand acted in concert with the position taken by the doffers.

This Court is of the opinion that the commission had before it evidence which would justify its finding that the fact of a labor controversy or dispute was in active progress.

The South Carolina Unemployment Compensation Commission, in its statutory authority to hear and determine cases arising under the pertinent statute, is analogous to the South Carolina Industrial Commission in its right to hear and determine matters arising under the Workmen's Compensation Act. Act July 17, 1935, 39 St. at Large, p. 1231.

In the case of *Rudd v. Fairforest Finishing Co. et al.*, 189 S. C., 188, at page 191, 200 S. E., 727, 728, this Court said:

"It is a familiar formula that findings of fact by a Board or Commission on a claim under a Workmen's Compensation Act are conclusive; and the appellate Court will not review such findings except to determine whether there is any evidence to support the award. It may reverse an award if there is an absence of any evidence to support it, but it is not a trier of facts. If the facts proved are capable as a matter of law of sustaining the inferences of fact drawn from them by the Board, its findings are conclusive in the absence of fraud, and neither this Court nor the Court of Common Pleas is at liberty to interfere with them. This is but an application to Workmen's Compensation cases of the fundamental principle universal in Courts of law, that whether there is any competent evidence is for the Court to determine, but whether the evidence is sufficient is a question for the jury; the function of the Commission being in that respect that of a jury in actions of law."

And in the same case, at page 196 of 189 S. C., at page 730 of 200 S. E., this Court said: " * * * We are not at liberty to extend by construction the meaning implicit in the language found in the Act in order to provide a more liberal rule of compensation than that which the legislature has seen fit to adopt."

In the earlier case of *Phillips v. Dixie Stores, Inc., et al.*, 186 S. C., 374, at page 377, 195 S. E., 646, at page 647, this Court said: " * * * If there were absolutely no evidence in support of the findings of fact by the commission, we might say that the question thus becomes a question of law. But whether there is a sufficiency of evidence is strictly a matter of fact, and the findings of the commission thereabout are final."

In his decree, the learned Circuit Judge, in passing upon the issue as to whether a labor dispute existed, said: "The

issues presented are not questions of fact and the parties do not challenge the commission's findings of fact. The plaintiffs challenge the commission's interpretation and application of the statute. Statutory interpretation has never been considered anything but a question of law and from this judicial function the Court cannot be precluded from any findings made by the commission."

Apparently the learned Circuit Judge was misled in this respect by the argument of counsel for the plaintiffs-respondents. While it is true that statutory construction is the province of the Courts, we hold that the question for this Court to determine in this case is the intent of the legislature, which, in our opinion, was to create an unemployment compensation commission authorized to administer, and to hear and determine among other things, matters of fact arising in claims under this Act. It was the intention of the legislature to create a fund, subject to certain stipulated exceptions, which would provide more stable employment, and to provide benefits for periods of unemployment.

Section 5 of the Act provides in part: "An individual shall be ineligible for benefits: * * *

"(d) For any week with respect to which the commission finds that his total or partial unemployment is directly due to a labor dispute in active progress in the factory, * * *."

It is obvious, therefore, that it was not the intent of the legislature to give the Courts the right to determine whether a labor dispute existed, for under Section 5 of the Act this right is patently given to the commission, whose duty it is to determine by the testimony and the evidence in each case whether certain facts existed, among them, whether or not a labor dispute existed, as a matter of fact. Accordingly, in the instant case, the commission has determined that a labor dispute did exist at the time and place under consideration, and has so declared by its findings; and by the express provisions of the Act, such

findings are final, just as the findings of a petit jury on the facts are final. Neither the Circuit Court nor this Court can interfere with those findings.

This Court said in the case of *Easler et al. v. Blackwell et al.,* 195 S. C., 15, at page 23, 10 S. E. (2d), 160, at page 164, "The true purpose of statutory construction is to determine the legislative intent (*State v. Stevens,* 173 S. C., 149, 175 S. E., 213), and each enactment of that body is to be construed in the light of its own context (*State v. [Columbia Ry., Gas] Electric Co.,* 112 S. C., 528, 100 S. E., 355)."

We believe that, under the foregoing holdings of this Court, the question as to whether a labor dispute existed in this case was a factual issue to be determined by the commission.

Having determined that the intent of the legislature was that the commission determine when a labor dispute exists under this statute, and the commission having decided that a labor dispute was in active progress at the Hampton Division, Pacific Mills, at the time herein discussed, the next question for our determination is: Were the claimants and those whom they represent unemployed directly as a result thereof?

Just as a labor dispute is a condition of fact under the statute, so is the issue as to whether the claimants' unemployment was directly due to it. This is of considerable importance under the unemployment compensation statute of the various states, where it has repeatedly been held that the commissions and the Courts are not concerned with the merits of the dispute. Their prime concern is to determine whether the total or partial unemployment of claimants "is directly due to a labor dispute * * *." When the existence of a labor dispute appears, the question whether such was the cause of the unemployment, or whether it was produced by some other cause, can be answered only by hearing and passing upon the evidence in the case. This

is the exclusive function of the commission, which has determined, after due hearing, that the unemployment of these claimants was directly due to a labor dispute, and in our opinion this determination is conclusive.

In our opinion, the Circuit Judge erroneously disregarded the legislative command that the findings of the commission, as to issues of fact, shall be conclusive, and that it was error on the part of his Honor to hold, as a matter of law, that the unemployment of the claimants was not due directly to the labor dispute in that "If the labor dispute clause is interpreted so broadly as to disqualify those claimants who were unemployed through no fault of their own, then violence will be done to the intent of the General Assembly."

The application of this Act, by the Circuit Judge, in such a way as to make absence of fault determinative of the existence of a labor dispute, and whether such was the direct cause of the unemployment, is a distortion of the provisions of Section 5 (d), and imposes on the commission the function, not intended by the legislature, of considering the merits of a dispute.

We think that the Circuit decree was influenced largely by the holding in the case of *Department of Industrial Relations v. Drummond,* Ala. App., 1 So. (2d), 395, 398, an Alabama case cited by the respondents. The Court of Appeals of Alabama said in its opinion therein: " * * * to us the conclusion is inescapable that the Legislature never intended that one, who has purchased his protection against involuntary unemployment, should be denied those benefits because of a 'labor dispute' in which he was in no way involved and the causes of which unemployment he, his agents or organization were powerless to avert."

This case is relied on by claimants so strongly that we feel that we should point out some of the essential differences between the unemployment compensation statutes of Alabama and of this State.

Unlike Section 5 (d) of our Act, the Alabama section did not go on to provide that an individual whose unemployment is directly due to a labor dispute shall be entitled to benefits provided he shows that "he is not participating in or financing, or directly interested in such labor dispute; * * * ," and that he does not belong to the same grade or class of workers, etc. Clauses (1) and (2) of Section 5 (d) of our statute, relating to participation and to grade or class of workers, eliminates the possibility of our being guided by the theory, suggested in the *Drummond case,* that the unemployment of a claimant is not directly due to a labor dispute when he is not at fault with respect to the dispute. Under our statute, the question of whether the claimants' unemployment was directly due to the labor dispute is to be determined by the commission, and the clauses of Section 5 (d), to which we have just alluded, provide certain restrictions which are not contained in the Alabama statute. Under our statute, the language clearly indicates that unemployment may be directly due to a labor dispute even though the claimant himself had nothing to do with the dispute and was not at fault. Our statute does, however, permit the claimant to receive benefits if he goes on to prove that he is not at fault *and* does not belong to the same grade or class, etc.

It is also noted that the *Drummond case* speaks of "one, who has purchased his protection against involuntary unemployment." In the State of Alabama, employees are contributors to the unemployment compensation fund, and thus they do purchase their protection. In this State the fund is maintained by the employer, and the employee contributes nothing. This fact, among others, marks a decided difference in the statutes of the two states. Another outstanding difference is that in the *Drummond case* the unemployment was, according to our understanding of the facts therein, due to the decision on the part of the coal company to close its mine in order to avoid the risk of possible violence, whereas

it could have continued, with a reduced force of miners, to operate without the strikers. In the present case the evidence is that the mills could not have operated without the striking doffers, battery fillers, and fly frame hands.

The Circuit Judge, in his decree, also relied heavily on Section 2 of the Act of 1936, which is the "Declaration of State Public Policy" preceding the more specific provisions of the Act.

This declaration of policy contains the following language, as cited in the Circuit decree: "The General Assembly, therefore, declares that in its considered judgment the public good, and the general welfare * * * require * * * the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

We think that too great reliance was placed by the Circuit Judge in the general language of the declaration of policy, which is in the nature of a preamble to the specific provisions of the Act. It is too well recognized to require the citation of authority that when words of general import are followed by words of particular or restricted import relating to the same subject-matter, the latter will operate to limit or to restrict the former. Certainly, the specific language of Section 5 (d) is a very definite limitation on the provisions in the preamble.

Under the North Carolina Act, Pub. Acts, 1936, Ex. Sess., c. 1, Sections 2 and 5 (d) are practically identical with the corresponding sections of our Act. In the case of *In re Steelman et al.,* 219 N. C., 306, 13 S. E. (2d), 544, 547, the Supreme Court of North Carolina considered and rejected the theory upon which the Circuit decree in this case largely rests. In that case a union to which some of the employees belonged, called a strike at the factory at which they were employed. Asserting that they were not in sympathy with the strike, and that they wished to work, the claimants, relying on Section 2, contended that they were entitled to

benefits because they were unemployed through no fault of their own. The North Carolina Supreme Court affirmed the commission's finding that the claimants were unemployed because of the labor dispute, that they had failed to bring themselves within the requalification clause, and that they were, therefore, all disqualified. The Court in that case said:

"The appealing employee-claimants take the position that the interpretation of this section is perforce controlled by the declaration of policy contained in Section 2 of the Act, the general designation of workers there selected for benefits being those who are 'unemployed through no fault of their own.' The Commission and the court below thought otherwise. They followed the usual and accepted rule of construction that 'where a statute expresses first a general intent, and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand.' [Citing authorities.]

\* \* \*

"Accordant with the terms of this section, the Commission found that the employee-claimants, appellants herein, were not entitled to benefits during the stoppage of work at the factory, establishment, or other premises of the Nebel Knitting Company because it appeared from the evidence that they were either (a) participating in or financing or directly interested in the labor dispute which caused the stoppage of work, or (b) that they belonged to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred, some of whom were participating in or financing or directly interested in the dispute. The ruling of the Commission was upheld on appeal to the Superior Court. It is supported by the language of the statute and the evidence in the case."

A similar case in point is that of *Chrysler Corporation v. Smith*, 297 Mich., 438, 298 N. W., 87, 91, 135 A. L. R., 900. The Michigan Act, Pub. Acts, 1936, Ex Sess., No. 1,

as amended Pub. Acts, 1939, No. 324, like our own, uses the phrase that the reserves are to be used for the benefit of persons "unemployed through no fault of their own." The Michigan disqualification clause, at that date, disqualified claimants whose unemployment "is due to a labor dispute which is actively in progress in the establishment in which he is or was last employed: Provided, however, That no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute." The company discharged about sixty men for engaging in slowdowns at the Dodge main plant. That plant was forced to close down because of "demoralization of production." Soon, eight other Chrysler plants in the Detroit area were likewise forced to close down for lack of essential parts made at the Dodge main plant, "the key to operation of all units." Thousands of employees in eight other plants were thus thrown out of work although there was no trouble in their plants. The principal issue was whether all the Chrysler plants in the Detroit area formed one establishment. If each plant was a separate establishment, many employees in the other plants would be entitled to benefits. The claimants contended that each plant formed a separate establishment, and that the word "establishment" should be construed in accordance with the declaration of policy, so that employees at the other plants, unemployed through no fault of their own, but merely because of the inability of their plants to obtain supplies from the key plant, should not be deprived of benefits.

The Michigan Supreme Court rejected this argument, and decided that all the plants formed a single "establishment" within the meaning of the statute. Thus the Michigan Supreme Court, like the North Carolina Supreme Court, held, in effect, that the statement of policy was inapplicable with respect to issues depending on the meaning of the disqualification clauses. Since the operations of the several plants were synchronized, and since certain employees could not

perform their tasks without the use of materials produced by other employees, we feel that the Michigan Court, in holding that the claimants who were thus thrown out of work were disqualified from receiving benefits has correctly decided a point analogous to the one here involved, in which the claimants contend that they should be paid benefits because they were "unemployed through no fault of their own."

Another recent case involving claimants who were unemployed through no fault of their own was that of *Huiet, Commissioner of Department of Labor, et al. v. Boyd et al.*, 64 Ga. App., 564, 13 S. E. (2d), 863, in which the Court of Appeals of Georgia held that employees who opposed a strike and were desirous of continuing their work, were, under the facts of that case, disqualified from receiving compensation. In that case the claimants contended that they were prevented from performing the work which they were anxious to perform by the presence of a picket line. The Georgia Court held that the claimants were disqualified, because they were unemployed on account of the "labor dispute," and they failed to bring themselves within the requalification provisions. The declaration of policy in the Georgia Act, Laws 1937, p. 806, contained the same words as the South Carolina Act—"unemployed through no fault of their own," and the disqualification clause is very similar to our own. The Georgia Court of Appeals said at page 867 of 13 S. E. (2d):

"It is immaterial that the claimants, whether as members of the union or not, may not have voted for or participated in the strike which caused the stoppage of the work, and may not have been in sympathy with the strike and may have attempted to go back to work but were prevented by the pickets  *  *  * ."

In the light of the foregoing decisions and authorities, we are of the opinion that the Circuit Judge erred in his holding in these particulars.

This brings us to the third question raised by the appeal: Did the claimants and those whom they represent belong to a grade or class of workers of which there were members employed at the premises at which the dispute existed any of whom participated in or were directly interested in said dispute?

The pertinent section of the Act, in stating what individuals shall be ineligible for benefits, used the expression "For any week with respect to which *the commission finds*" that unemployment is due to certain conditions. In the same sentence the Act further uses the expression: "Provided that this subsection shall not apply if it is shown *to the satisfaction of the commission*" (emphasis added) that certain conditions do not exist. One of the conditions which must not exist is that claimant must "not belong to a grade or class of workers of which, immediately before he became unemployed by reason of such dispute, there were members employed at the premises at which the dispute exists, any of whom are participating in or directly interested in such dispute." The two foregoing emphasized passages above indicate clearly that the question of grade or class is a question of fact, to be determined by the commission. It is for this Court to say whether there was any competent, admissible evidence to sustain its finding of fact.

The testimony in the case reveals that the claimants, together with the employees who refused to work, were engaged in a continuous, integrated, coordinated process. All of the jobs were semi-skilled in character and involved no extensive training. These jobs had common purposes and characteristics. Pay and hours of work were practically the same. All added about a similar value to the product. The only appreciable difference lay in the exact manual manipulations of each task. The work of all of these employees is interdependent and their combined efforts are required to make the product manufactured at the Hampton Division. This manufacture requires a series of integrated processes,

and the stoppage of work by employees performing one particular kind of operation means that production by other groups must necessarily cease.

In our opinion the evidence upon which the commission based its findings of fact conclusively indicates that there was sufficient evidence before the commission to sustain its finding that the conditions under which the claimants worked, and the nature of their work, placed them in the same grade or class of workers of which, immediately before they became unemployed, "there were members employed at the premises at which the dispute exists, any of whom are participating in or directly interested in such dispute."

These conditions were inquired into by the commission by inquiring: "Do they work under the same general conditions and the same general management? Do they perform the same general type of service? Are their general interests the same? Do they work in a chain of production in which the operations of one group depend on the continuance of the work of the others?" The commission found the answers to all of these questions to be in the affirmative. The claimants, together with the employees who quit voluntarily, were all textile workers engaged in production work in the Hampton Division of the Pacific Mills, in Columbia.

The fact that there was only one bargaining agency for all of the production workers who were members of the union seems to us to indicate that they were all members of one grade or class. All of them worked with their hands in the processing of goods which cannot be produced unless all of the different processing workers properly perform their tasks. The commission found that the various grades of processing workers formed a large general class of textile workers having the same general interest and general characteristics. The commission found that the class as a whole has but one collective bargaining agency, the Textile Workers Union of America. The name of this bargain-

ing agent implies that all of its members are members of a single class with the same general objectives and standards. The evidence before the commission indicated that there was no bargaining agent in any of the plants for the doffers as such, the weavers as such, or for any other occupational grade as such. The workers themselves chose a single bargaining agent, and at the meeting on September 15, 1940, when the workers voted to try the new conditions of employment, there were present representatives of the general class irrespective of their occupational grade. This general class was composed of the processing workers of the Hampton Division of the Pacific Mills. The commission found, as a matter of fact, upon the basis of the evidence before it, that the particular nature of their jobs, and the relationships existing therein, placed the claimants and those who quit work voluntarily in the same class of workers. We think there was adequate evidence before the commission to warrant its finding that upon the foregoing facts, and the fact that all of the workers under consideration were workers in the mills, working with their hands, were paid more or less similar wages, and whose work was a necessary part of the flow of goods through the establishment wherein they were employed, were all members of the same class.

The commission has stated in its brief : "To attempt any other classification would result in injustice and absurdity. There is no intermediate point at which some group of such workers might be disqualified from receiving benefits and others held eligible. There is no basis for subdividing these production workers into different classes on the basis of wages; practically all of the production workers work at piece rates, and although differences in rates exist with various operations, there is no such variation in the wages paid as would justify a grouping in different categories or classes. It is clearly impossible on any reasonable basis to subdivide employees into different classes on the basis of the mechanical nature of the operations they perform. All of the opera-

tions are necessary in the production of the goods. It would be obviously unjust to qualify or disqualify any group of employees on such a basis. Nor do differences of skill justify any distinction. While some are more skillful than others, the work of all is essential. There is no reasonable basis for disqualifying a frame hand because he may have slightly less skill than a weaver. Many employees are capable of doing several different operations and in slack periods under the company's seniority system may do so."

The Connecticut Commission in the decision in No. 150-A-39, says:

"Those in the class are akin to partners in a venture, one indispensable to the other, in that they mutually depend upon each other for the opportunity to labor in the same line of production, the work and wages of one restricted or restrained by his dependency on the other, with an obvious and real dependent connection between those who are engaged in the first operation in the line of production and those performing the last.

"The stoppage was neither plant-wide nor union-made but it was class-wide. Hence all individuals who are embraced by the class, of which the weavers are members, are disqualified for benefits * * *."

The class referred to in the foregoing decision concerned velvet workers, whereas the case at bar concerns cotton mill workers. The decision in the Connecticut case cited above held, in effect, that all the production employees in a textile mill were disqualified when one occupational group, comprising only a portion of a department, went out on strike, even though the dispute between the strikers and the company in no way concerned the working conditions of the other groups.

The commission, in its brief, points out that in Black's Law Dictionary, third edition, the term "class" is defined: "The order or rank according to which persons or things are arranged or assorted. Also a goup of persons or things,

taken collectively, having certain qualities in common, and constituting a unit for certain purposes."

In connection with this general question, the commission states in its brief: "When it is held that an employee who refuses to work because of a labor dispute is not entitled to compensation but that other workers in the same establishment normally belonging to the same general group or unit are qualified for benefits, the door is opened to great possible abuse. Since a comparatively smaller number of employees doing some particular work at a key point in a process or industrial operation can close a plant down in any case of a labor dispute by not working, there might exist a temptation to have only a small number at such a point strike while the balance of the workers in the same general group would claim unemployment compensation even though they might be equally interested in the outcome of the dispute."

It is further pointed out in the brief of the commission: "The Commission was again confronted with the task of interpreting or defining a term of the Act—this time 'grade or class.' It adopted the cardinal rule of construction that words be given their ordinary meaning where it is possible to do so in construing legislative acts. Our Court in *Powers v. Fidelity & Deposit Co. of Maryland,* 180 S. C., 501, 186 S. E., 523, held that the Legislature is presumed to have fully understood the import of the words used in a statute and intended to use them in their ordinary and common meaning unless vague or indefinite, or in their well-defined legal sense, if any. The following are pertinent definitions of 'class':

"Webster's Dictionary: 'A group of individuals right together as possessing common characteristics or as having the same status.'

"Bouvier's Law Dictionary: 'A number of persons or things right together for some common purpose or as possessing some attribute in common.'

"The word 'grade' has a narrower connotation than the word 'class' and is generally used to denote the rank or relative position of employees in a common service (4 Words & Phrases (1st), 3141 [18 Words and Phrases, Perm. Ed., p. 604], 28 C. J., 754). Therefore, it would seem that a class of workers could include several grades."

It is not the province of this Court, under this proceeding, to look beyond the evidence in this particular case and to venture into fields of speculation as to what might occur under states of fact which are not in evidence. Nor does this Court believe that it is incumbent upon it, in this case, to prepare and adopt definitions of such phrases as "labor dispute" and "grade or class" which the legislature has not defined.

The language of Section 5 (d) enumerates certain workers who shall not be eligible for benefits "for any week with respect to which the commission finds" that certain conditions exist, and provided that this part of the Act shall not apply if certain conditions are "shown to the satisfaction of the commission." In our opinion, therefore, the determination of these conditions was intended by the legislature to be for the commission to decide, upon the evidence, insofar as conditions of fact are concerned. We hold that there was evidence before the commission to sustain its findings of the conditions of fact which existed at the Pacific Mills, Hampton Division. By whatever mental processes the commission arrived at its interpretation of the phrases used but not defined in the Act, we are of the opinion that the question for our determination, under the quoted sections of the Act, is whether the commission had before it sufficient evidence to warrant its findings under the facts which were "shown to the satisfaction of the commission." It is not for us, in this proceeding, to define terms (not defined in the Act) which, under some future state of facts, not now before us, might conceivably constitute a "labor dispute." It is rather for us to determine whether the commission, under the Act, was

justified in its findings, under the evidence, that a labor dispute and other states of fact existed in the present instance.

Our purpose in this case is not to attempt to determine whether the commission has adopted definitions of such terms as "labor dispute" which will be applicable to states of fact which have not yet arisen, but to inquire into such questions as: Why were these claimants unemployed? Under the evidence, they were not discharged by the Pacific Manufacturing Company. We believe that the commission was justified in finding that there was evidence that they were unemployed because their fellow-workers quit work of their own accord because of a controversy, dispute, or failure to agree as to matters pertaining to facts relating to their conditions of employment.

It is apparent that the claimants in this case did not comply with the burden, placed upon them by the statute, of showing to the satisfaction of the commission the matters set forth in Section 5 (d).

The Circuit decree appears to hold that the alignment of the claimants with reference to the dispute over the work loads, was the basis upon which it should be determined whether the claimants belong to the same grade or class as the strikers. In other words, the Circuit decree seems to hold that if the claimants did not share the views of the strikers with reference to the work loads, they could not belong to the same grade or class. Under this theory, as was pointed out by the defendant-appellants, if two men operated the same machine and did exactly the same work, and if one walked out on strike and one desired to work, the latter would not belong to the same grade or class as the former.

. We are of the opinion that the commission correctly recognized that Section 5(d) (1) and Section 5(d) (2) establish separate conditions, both of which a claimant must satisfy. Section 5(d) must be read to give effect to both conditions. Section 5(d) (2) cannot be so construed as to render the grade or class provision to have been satisfied

by compliance with the terms of the preceding subsection, for in that event Section 5(d) (2) would be devoid of meaning.

The final question for determination is whether the commission was justified in its finding, as a matter of fact, that immediately before the claimants became unemployed, there were members of the same grade or class employed at the Hampton Division of the Pacific Mills, *"any of whom are participating in or directly interested in such dispute."* The briefs of the parties have dwelt at considerable length upon the emphasized quotation from Section 5(d) (2). The evidence in the case is replete with facts, uncontroverted, which leave no doubt in our minds that the commission had before it ample evidence that there were textile employees at the Hampton Division of the Pacific Mills who were, at the time indicated, "participating in or directly interested in such dispute." Applying the principles to the quoted clause which we have already discussed and applied in regard to other clauses of Section 5 (d), we hold that the commission should have been sustained in its finding of fact herein for the reason that there was competent testimony to support such finding.

This case gives rise to questions which in themselves are the source of an almost infinite number of other questions, so that the by-paths which could be followed in the course of the preparation of an opinion are almost endless. It has therefore not been possible to discuss at length all of the arguments in the able briefs of counsel, but all of the arguments and cited authorities were examined and considered.

The exceptions are sustained and the judgment of the Circuit Court is reversed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES and MR. ACTING ASSOCIATE JUSTICE M. M. MANN concur.

CIRCUIT JUDGE G. DUNCAN BELLINGER, ACTING ASSOCIATE JUSTICE (dissenting) :

This is an appeal from a decree of the Circuit Court of Richland County, setting aside Decision No. 40-C-12 of the South Carolina Unemployment Compensation Commission and ordering the commission to pay to the plaintiffs-respondents and those they represent certain unemployment compensation.

The respondents, employees of Pacific Mills, Hampton Division, representing all weavers, loom fixers, doffers, frame tenders, spoolers, cloth-room help, card hands, general labor, and auxiliary help, other than those named, were permitted, under the Regulations of the South Carolina Unemployment.Compensation Commission, to bring his action as groups, representing different craftsmen, before said commission as "group test claimants." These claimants are representatives of different classes of craftsmen engaged in the textile industry of Pacific Mills, and are representative of those classes or groups of craftsmen who had not stopped work, but endeavored to continue their work, and were prevented from doing so by reason of the refusal of another class or group of craftsmen failing to report for work. That class or group of craftsmen refusing to continue to work represented a very small percentage of the entire number of workmen engaged by the Pacific Mills, Hampton Division, in the processing or manufacture of cloth. This strike of the small majority which brought about the stoppage of work was not sanctioned by the bargaining agency and was therefore an outlaw or rump strike.

The regulation of the South Carolina Unemployment Compensation Commission under which these claims were instituted, have the effect of law.

Under its regulation and under the written claim filed, the South Carolina Unemployment Compensation Commission entertained the claims made by representatives of the various *classes* or *crafts* of *workers,* thereby recognizing that while all the workers were engaged in the process of producing or manufacturing cloth, the production thereof

was the result of work of different crafts or classes. In other words, the commission itself, in the manner whereby the claim was instituted, recognized various classes or crafts and grades of workmen, there being, according to the written claim, eleven various classes representing that many trades or crafts in a specific field or calling, necessary to the manufacturing or processing of cloth.

The facts and questions involved are stated fully in the decree of the learned trial Judge, and are here reproduced:

"On November 9, 1940, the commission rendered an initial determination in the case of Johnson, Tarlton and Cole who, pursuant to Regulation 12(d) (5) providing that the Commission's decision in the case of 'one of a group representing a grade or class of workers similarly situated * * * shall be binding as to the entire group,' at the hearing held before the Commission's claims examiner on October 11, 1940, were chosen, with others, to represent the workers of the various occupations and departments in the Hampton Division. It was determined that none of the claimants were entitled to benefits. The claimants, pursuant to the procedure set forth in the Act appealed the determination which was thereafter affirmed and adopted by the commission on December 3, 1940. The commission decided that the claimants were disqualified from benefits because their unemployment was due to a labor dispute and because they had not satisfied the commission that they were not members of a grade or class of workers of which there were members any of whom were participating in or directly interested in the labor dispute. The commission held, however, that the employees of one plant none of which participated in or financed the dispute, were entitled to benefits because they worked in a 'separate factory.' The claimants filed a petition for review and in compliance with the Act the commission has filed the entire record with the Court. At the time of argument counsel for Pacific Mills submitted a brief in which it was contended that the commission's decision in this particular was

erroneous. Since the Pacific Mills did not appeal from the decision of the commission that portion of the findings and the decision on this point is not now before me and cannot be disturbed on appeal.

"The determination of the questions before me involves the interpretation of Section 5(d) of the Act which provides that benefits may not be paid to those claimants who:

" 'For any week with respect to which the commission finds that his total or partial unemployment is directly due to a labor dispute in active progress in the factory, establishment or other premises at which he is or was last employed; Provided that this subsection shall not apply if it is shown to the satisfaction of the commission that:

" '(1) He is not participating in or financing, or directly interested in such labor dispute; and

" '(2) He does not belong to a grade or class of workers of which, immediately before he became unemployed by reason of such dispute, there were members employed at the premises at which the dispute exists; any of whom are participating in or directly interested in such dispute.

" 'Provided, Further, That if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall for the purpose of this subsection be deemed to be a separate factory, establishment or other premises.'

"The Pacific Mills is engaged in the manufacture of grey goods and has a division in Columbia, South Carolina, known as the Hampton Division, which consists of four plants employing more than two thousand (2,000) workers, the Olympia, Granby, Richland and Capital City plants.

"Prior to Monday, September 16, 1940, the Pacific Mills rearranged the work load in the four plants, which rearrangement was to take effect on Monday, September 16, 1940. The change had the effect of increasing the work load of a majority of the employees in the four plants. Before

the effective date the management discussed this rearrangement with the shop committee and representatives of the Textile Workers Union of America which has been declared by the National Labor Relations Board to be the statutory collective bargaining agent for the employees. Local No. 254 of the Textile Workers Union of America held a special meeting on Sunday, September 15, 1940, discussed the new work load, and voted to try the same.

"Following the meeting of the union of Sunday, September 15, the doffers held a meeting and decided not to report for work on the next morning.

"On the following day, the spinning doffers did not report for work on the first, second and third shifts at the Olympia plant. Likewise, the spinning doffers did not report for work on the first, second and third shifts at the Richland plant. The battery fillers at the Richland plant walked out of the weave room on Tuesday, September 17, at 9 A. M., these workers being employed on the first shift. The second and third shift battery fillers did not report for work at the Richland plant on September 17.

"At the Granby plant, the fly frame hands on the second shift walked out of the plant at 3:30 on Tuesday afternoon, September 17; these employees did work on Monday. The fly frame hands on the third shift did not report for work on Tuesday, and neither did the fly frame hands on the first shift report for work on Wednesday, September 18th. At the Granby plant, the bobbin cleaning hand did not report for work on the second and third shifts on Tuesday, September 17, nor on the first shift on Wednesday, September 18th.

"The questions to be decided are:

"(1) Was the unemployment of the claimants directly due to a labor dispute in active progress during the several weeks for which they claim benefits? (None of the employees who quit work at any of the plants or who failed to report for work have presented claims for benefits. The claims

of all the other employees were, pursuant to the commission's group test claim procedure, the subject for determination by the commission.)

"(2) Assuming that their unemployment was directly due to a labor dispute, were the claimants participating in, financing or directly interested in the labor dispute

"(3) Also assuming that their unemployment was directly due to a labor dispute, did the claimants belong to a grade or class of workers of which there were members any of whom were participating in or directly interested in the labor dispute?"

At the outset we are met with the question, Did the appeal to the Court in the manner provided by the Act, present questions of fact which the trial Judge was precluded from reviewing, or did such resort to the Court's present questions of law involving the construction and interpretation of the Unemployment Compensation Law and the application of such legal principles to the facts of the instant case? The Circuit Judge decided that the questions before him were questions of law. In this decision I concur.

The Circuit Judge held that there was no "labor dispute" within the meaning of the Act, however, the opinion of the Honorable Chief Justice in discussing the presence or absence of a "labor dispute" sets forth "that it was not the intent of the Legislature to give the Courts the right to determine whether a labor dispute existed * * * as a matter of fact," and that "neither the Circuit Court nor this Court can interfere with those findings." If, in fact, and in law there was no "labor dispute" in existence at the time in question, the judgment of the lower Court should be affirmed. I do not agree that the question of the existence of "a labor dispute" is purely and solely one of fact, which the Courts are forbidden to inquire into. If that be correct, the decision of the commission would be final in every instance, and the party unsuccessful before the commission would be deprived of the legal right of appeal. It is my opin-

ion that the Circuit Court, and this Court, may inquire into the facts as testified to, with a view of determining if there is *any evidence* to support such finding. It has always been the rule that the question of whether there is any competent evidence is a question of law for the decision of the Court. *Phillips v. Dixie Stores, Inc.,* 186 S. C., 374, 195 S. E., 646.

I am of the opinion that the question as to whether or not a "labor dispute" existed within the meaning of the Unemployment Compensation Act of South Carolina under the facts of this case, depends upon whether the Act in question is construed and interpreted liberally as provided by the provisions of Section 2 of the Act, which declares the state public policy, or if the provisions of Section 5(d) of the Act is to be given such a meaning as to make meaningless the provisions of Section 2. The question therefore becomes narrowed to the point of law, as to what was the legislative purpose in enacting the Act in question.

In the opinion of the Chief Justice the view is expressed that the provisions contained in Section 2 are limited and circumscribed by the provisions of Section 5(d) and the opinion cites with approval, *In re Steelman et al.,* 219 N. C., 306, 13 S. E. (2d), 544, a case in which the Supreme Court of North Carolina so construed a similar declaration of policy. However, while the decisions of the Supreme Court of our sister state are entitled to the greatest consideration, I cannot agree with the conclusions reached by the Supreme Court of North Carolina in that case. There is no question that the legislature may use words of general import and subsequently limit their meaning by words of particular or stricted import relating to the same subject-matter.

But, the question here is, did the legislature of this State intend to limit the provisions of Section 2 by the enactment of Section 5(d)? I do not conceive that such was the purpose of the enactment of Section 5(d), for to ascribe such purpose to the legislature would be to nullify Section 2, and defeat the whole plan of the Act.

Section 2 of the Act provides: "As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the General Assembly to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The General Assembly, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

Section 5(d) of the Act provides:

"(d) For any week with respect to which the commission finds that his total or partial unemployment is directly due to a labor dispute in active progress in the factory, establishment or other premises at which he is or was last employed; Provided that this subsection shall not apply if it is shown to the satisfaction of the commission that:

"(1) He is not participating in or financing, or directly interested in such labor dispute; and

"(2) He does not belong to a grade or class of workers of which, immediately before he became unemployed by reason of such dispute, there were members employed at the

premises at which the dispute exists, any of whom are participating in or directly interested in such dispute.

"Provided, Further, That if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall for the purpose of this subsection be deemed to be a separate factory, establishment or other premises."

The last sentence of Section 2, above quoted, specifically provides that the benefits of the Act shall inure to *persons unemployed through no fault of their own.*" To give Section 5(d) the meaning contended for by appellants would entirely nullify the meaning of the above-quoted portion of Section 2 of the Act, without reason and in violation of certain well-recognized rules of statutory construction.

In *City of Spartanburg v. Leonard,* 180 S. C. 491, 186 S. E., 395, this Court laid down the following rule of statutory construction: "In ascertaining Legislature's intent, court is not governed by apparent meaning of words in one clause, sentence, or part of statute, but by consideration of whole act, read in light of conditions and circumstances as they appeared to Legislature and purpose sought to be accomplished."

In *Purdy v. Strother,* 184 S. C., 210, 192 S. E., 159, the rule was stated in the following language: "In construing statutes, court will endeavor to reconcile if it can, any apparently conflicting provisions of two sections of same statute so that all parts thereof might be given, as far as possible, full force and effect."

If Section 2 is permitted to control the interpretation of Section 5(d), the rule laid down in the *Spartanburg* and *Purdy cases, supra,* will be consistently followed; however, to permit Section 5(d) to limit or circumscribe the meaning to be given Section 2 will be in violation of that rule.

As the Circuit Court decree states "Time and again Courts and Commentators have referred to declarations of policy

or preambles in order to resolve contested meanings of ambiguous terms. *Virginian Railway Co. v. System Federation,* 300 U. S., 515, 563 [57 S. Ct., 592], 81 L. Ed., 789, 808; *United States v. Hutcheson* [312 U. S., 219], 61 S. Ct., 463 [85 L. Ed., 788]; *United States v. Darby* [312 U. S., 100, 657], 61 S. Ct., 451 [85 L. Ed., 609, 132 A. L. R., 1430]; *Dougherty v. United States* [58 App. D. C., 308], 30 F. (2d), 471, 472; *White v. Levy,* 91 Ala., 175 [8 So., 563]." This Court, in *Ponder v. City of Greenville,* 196 S. C., 79, 12 S. E. (2d), 851, 855, said: "It is, of course, well settled that the title of an act may be resorted to for light on its construction." *Arthur v. Johnston,* 185 S. C., 324, 194 S. E., 151.

It is equally well settled that social legislation is remedial and is to be liberally construed in favor of the empoyee.

In view of the foregoing principles, the various provisions of Section 5(d) of the Act, must be interpreted so that they will effectuate the declared policy of the General Assembly, *i. e.,* that the unemployment reserves be used for the benefit of persons unemployed "through no fault of their own."

As the Circuit Judge pointed out, the record is clear that the refusal to work by the doffers, battery hands, fly frame hands and bobbin cleaning hands, and their reason for such refusal, did not involve the statutory sole collective bargaining agent, which, under the provisions of the National Labor Relations Act, was the only legal representative of all the workers. The overwhelming majority of the workers cannot be denied benefits since they were ready, willing, and able to work at all times, and since neither they nor their statutory collective bargaining agency had any dispute with the employer. If the labor dispute clause contained in Section 5(d) is interpreted so broadly as to disqualify those claimants who were unemployed through no fault of their own, then violence will be done to the intent of the General Assembly, as expressed in Section 2 of the Act. If this man-

date of the legislature is to be charged, it must be changed by the legislature, and not by the Court.

The Unemployment ·Compensation Commission and the opinion of this Court, as written, found that the claimants were disqualified because their unemployment was due to a labor dispute. It appears that the commission and the majority opinion of this Court failed to give consideration to the word "directly" appearing in the statute as amended. This word was inserted before the phrase, "due to a labor dispute." The insertion of the word "directly" must certainly have been put into the statute in order to establish a clear causal relationship between the labor dispute and the unemployment, so as not to disqualify those unemployed through no fault of their own.

I here, for emphasis, quote with approval from the learned trial Judge's decree, for he, in very clear and convincing terms, disposed of this question:

"The Supreme Court of Alabama, in the *Drummond case*, cited below, also found the use of the word 'directly' in the similar Alabama statute, of great significance in limiting the labor dispute disqualification. In that case the claimants, members of an A. F. of L. affiliate, were unemployed because of a dispute between the employer and the C. I. O. affiliate.

" 'This therefore, was the direct cause of appellee's unemployment and not the "labor dispute" in which the C. I. O. affiliates were involved. The Trial Court, therefore, in our opinion correctly held, and this Court also finds the fact to be that appellee's unemployment was not "directly due to a labor dispute still in active progress in the establishment in which he is or was last employed." '

"The Commission (South Carolina Unemployment Compensation Commission) adopted the definition of 'labor dispute' found in the Wagner Act, the Norris-LaGuardia Act and the New York and Massachusetts Labor Relations Act,

and applied them to the facts in this case without consideration of the *different purposes of these statutes.*

"It must be held as a matter of law under the facts found by the commission that the unemployment of these claimants was not directly due to a labor dispute. The highest Court of Alabama, in a case directly in point, *Department of Industrial Relations v. Drummond,* Ala. App., 1 So. (2d), 395, 398, affirmed an opinion adopted March 27, 1941, by Alabama Supreme Court, 241 Ala., 142, 1 So. (2d), 402, dealing with similar facts and with the same contention that the definition of a labor dispute used in other statutes must be interpreted by reference in an unemployment compensation statute and applied as though it were an injunction or labor relations statute said:

" 'The ingenious argument of the able counsel for appellant that for this case, as regards the status of appellee, we adopt for construction, here, the definition of a labor dispute as used in the Norris-LaGuardia Act, 29 U. S. C. A., § 113(c), and National Labor Relations Act, 29 U. S. C. A., § 152(9), is unconvincing. Irrespective of whether or not these definitions, if applied to this case, would aid in controlling the question, the term, as there used, is expressly restricted to and subsumed under the declared policy and purposes of the Acts, themselves, which are among other benefits sought to be accorded the worker, preservation and encouragement of the right to organize and bargain collectively. Thus the broad and flexible definition comprehended in the Federal Acts and variously approved by judicial construction. But it is unwarrantable that such statutory definition obviously given a comprehensive meaning in the Federal Law seeking to benefit the worker, should be torn from its original setting and, by judicial interpolation, be read into the Alabama Act so as to be destructive of the elemental purpose of the Act, *i. e.,* the relief of unemployment.

" 'In the case of *Kieckhefer Container Co. v. Unemployment Compensation Commission,* 125 N. J. L., 52, 13 A.

(2d), 646, 647, an analogous question was presented, where the "labor dispute" disqualification clause of the New Jersey Unemployment Compensation Statute was under consideration by the Supreme Court of that State. While such clause in the New York Statute, N. J. S. A., 43:21-5(d) (1, 2), is not altogether similar to that of the Alabama Act, the view expressed by that court with reference to an almost identical situation as the appellee's plight here (in that case a non-union employee rendered unemployed by reason of a strike of the union employees and the consequent shutdown of his establishment) strongly supports the conclusions in the case at bar by this court.'

"In the above case the claimant was a member of the Captive Coal Miners' Union and was unemployed as the result of a labor dispute between the United Mine Workers of America and the employer. The Court, in granting benefits to the claimant because neither the claimant nor his union was engaged in a labor dispute with the employer said:

" 'The record is further clear that appellee and his organization had an existing contract under which they were working, were in no disagreement of any character with the employer or anyone, wanted to continue to work and urged the employer to allow their employment to so continue, irrespective of the conduct, contract or attitude of the United Mine Workers of America. For reasons of its own, however, and utterly beyond the control of appellee or his union, this was not compatible with the wishes of the employer and hence the closing of the mine and the resulting unemployment of appellee.' "

From the foregoing authorities it will be seen that the respondents in the case before this Court were not disqualified to receive the benefits under the Act by reason of Section 5(d) of that Act.

Even if respondents' unemployment had been due to a labor dispute, the question then arises, were they partici-

pating in or financing, or directly interested in such labor dispute?

Again quoting with approval from the Circuit Court decree:

"In defining 'directly interested' it must be noted that the term is found in the first requalification paragraph with the terms 'participated in' and 'financed.' The first requalification paragraph begins with the singular 'he' rather than the plural 'they'. It must therefore be assumed that the General Assembly intended the term 'directly interested' to refer to the activity of an individual, not a group, doing some overt act in furtherance of the labor dispute. The meaning of the terms of a statute are known by the company they keep and derive life and color from the context. During the argument of this cause counsel for the commission, displaying commendable candor, stated that the decisions defining this and other terms found in all the unemployment compensation statutes are in hopeless and contradictory confusion. It is again apparent that the term must therefore be interpreted so as to effectuate the declared policy of the Act. Directly in point is the decision of the highest Court of New Jersey, which said in the case of *Kieckhefer v. Unemployment Compensation Commission,* 125 N. J. L., 52, 13 A (2d), 646, 647:

" 'The argument [of the employer] is that, inasmuch as every employee was interested in the improvement of his working conditions, rate of pay and other matters related to his employment, therefore, each employee was "directly interested in the labor dispute which caused the stoppage of work." * * * *The clear meaning of the language is to confine disqualification to those who are creating the dispute or participating therein in order to enforce their demands.* To accept the prosecutor's construction would render every employee of a business, some of whose employees went on strike, ineligible for benefits, notwithstanding his non-participation therein and even though he might be opposed to

the labor dispute and decline to have any part therein. The use of the words "directly interested in the labor dispute" clearly limits their application to those employees directly interested in its furtherance by participation and activity therein. (Italics added.)'

"Some of the decisions of Unemployment Commissions which are in conflict with Kieckhefer decision construe the term 'directly interested' to mean 'directly affected.' But even under those decisions the claimants in the case at bar would be requalified for benefits because they were in no way affected by the dispute which involved only the refusal of the fly frame hands, battery hands and bobbin cleaning hands to work under the new conditions. The wages, hours and work loads of the claimants were in no way involved in the dispute, which concerned only the number of machines to be tended by the four categories of workers above mentioned."

It is therefore my opinion that the evidence here shows positively that the respondents neither participated in, financed, nor were they directly interested in such labor dispute, and there is no evidence to the contrary.

Did the respondents belong to the same grade or class as those employees who voluntarily refused to work?

The Regulations of the South Carolina Unemployment Commission provide for group test claims and it was under those regulations that these claims were filed. The rule under which these claims were filed is found at page 2866 of the Acts of 1940, and provides as follows: "After the determination as provided in said Subsection 2 of this Regulation, the Commission may, *upon written request by a group of workers, allow one of a group representing a grade or class of workers* similarly situated to file a claim for benefits, which shall be known as a 'Group Test Claim,' and the Commission's decision as to the disqualification of the representatives shall be binding as to the entire group. The Commission may also provide that the filing of continued

claims by such representative of the group shall constitute continued claims for each individual of the said group." (Italics supplied.)

Acting under the foregoing rule the claimants filed their respective claims in this form:

> "Columbia, South Carolina
> "October 10, 1940

"South Carolina Unemployment Compensation Commission
"1003 Main Street
"Columbia, South Carolina

> Attention: *Claims Division*

"Gentlemen:

"We, the undersigned, beg leave to file this as a written request for Your Commission to consider the claims for unemployment compensation of all the Employees of the Pacific Mills, Hampton Division with the exception of those who voluntarily failed to report for work on or after September 16, 1940. We, the undersigned, represent all *groups* and *classes* of the employees of the Pacific Mills, Hampton Division, with the exception of those above stated, and file this application for unemployment compensation on their behalf pursuant to Section 12, Subdivision D, 5 of the Rules and Regulations of Your Commission. (Italics supplied.)

> "(Signed)  MYRTLE CLOUGH KIRKLAND,
> *Weaver.*
> "C. L. TARLTON,
> *Loom Fixers,*
> "JEROME GOINS,
> *Section Men,*
> "ALICE PLAXICO,
> *Spinners,*
> "D. J. COLE,
> *Slasher Men,*
> "SIMON MIMS,
> *Doffers,*

"C. M. QUITDIEL,
  *Frame Tenders,*
"LUDIE GILIAN,
  *Spoolers,*
"THADDEUS EUGENE GIBSON,
  *Cloth Room Help,*
"LAWRENCE LEE,
  *Card Hands,*
"GEORGE L. BROWN,
  *General Labor and all Auxiliary Help Other Than Above Named."*

It is very significant that eleven different persons representing eleven different groups of craftsmen signed the claim, and it was accepted by the commission as being correct in form and in full compliance with the regulation. The commission thereby recognized that there were different classes of craftsmen, skilled in their respective fields, separate and distinct from each other in the manner and kind of work performed. If this be not true, and if there were only one class of workmen, consisting of *all* of those who participated in the manufacture of the product, the claim would have been filed, *not by eleven different representatives of the various classes of crafts,* but would have been filed by a single person representing all those employed by the Pacific Mills, Hampton Division, in the manufacture of the product. In view of the Act, the regulation and the claims as filed, it is readily apparent that the meaning of "class" or "grade" as construed by the commission and approved by the majority opinion herein makes meaningless the regulation of the commission hereinbefore set out, as well as the Act in question; for the reason that if all persons who do *any* work in the processing of the manufactured article belong to the same class or grade, regardless of the craft or trade to which they belong, there could be no classes or

grades, and therefore no "group test claims" filed as provided for in the regulation of the commission.

The term "class", as used in the Act, means those workers similarly situated, doing the same kind and nature of work, skilled in a special field or calling, and this forbids the idea that *all* textile workers belong to the same class. The term "grade" as used in the Act carries with it the idea of rank. In each craft or class of workmen in the textile industry there are those who act in supervisory capacities, that is, occupy a superior position to those who do the manual work. If this construction be not given to the terms of the Act, then the use of those terms in the Act and Regulation of the commission is meaningless. The meaning of "class" or "grade" as adopted by the commission and by the majority opinion of this Court, does violence to the declared policy of the legislature as set forth in Section 2 of the Act.

It is with the utmost deference to my brethren of the Court that I differ in the opinion of the Honorable Chief Justice, but for the reasons hereinabove set forth, I cannot concur.

It is therefore my opinion that the respondents herein were not disqualified from the benefits under the Act by reason of Section 5(d), but even if they had been so disqualified, they were requalified under Subsections 1 and 2 of Section 5(d). The decree of the Circuit Court should therefore be affirmed and made the judgment of this Court.